Theodore **CORTAZZO** and wife, Deloris Cortazzo, Plaintiffs/Appellants,

v.

Terry **BLACKBURN** and Troy Blackburn, Defendants/Appellees.

Court of Appeals of Tennessee,
Middle Section at Nashville.

Aug. 4, 1995.

Application for Permission to Appeal
Certiorari Denied by Supreme Court
Nov. 20, 1995.

Russell D. Hedges, Moore & Hedges, Tullahoma, for Plaintiffs/Appellants.

Patrick J. McHale, Brentwood, for Defendants/Appellees.

## OPINION

TODD, Presiding Judge, Middle Section.

The captioned plaintiffs have appealed from a jury verdict and judgment awarding Theodore Cortazzo $25,000 for his personal injuries and property damage and loss of consortium of his wife, Deloris, and awarding Deloris Cortazzo $10,000 for her personal injuries and loss of consortium of her husband, Theodore, resulting from a collision when a vehicle owned by Troy Blackburn and operated by Terry Blackburn struck the rear of a trailer attached to the rear of a vehicle occupied by plaintiffs.

On appeal, plaintiffs present five issues regarding instructions to the jury and one issue regarding refusal of additur.

*–The Facts–*

On October 15, 1990, the date of the collision, plaintiffs occupied a pickup-truck which was pulling a heavy steel "lowboy trailer" which was designed and used to transport a single automobile, but was empty at the time. As the plaintiffs' truck slowed to make a right turn, a loaded dump truck operated by Terry Blackburn struck the trailer in the rear. Pictures in the record illustrate the damage to the rear of the trailer, the "hitch" mechanism which attached the trailer to the pick-up truck and the distortion of the bumper of the truck. Plaintiffs describe the collision as violent causing their heads to collide with the inside of the cab of their truck. Both plaintiffs complained of dizziness and pain and were transported by ambulance to a hospital.

From October 15 to October 19, 1990, Mr. Cortazzo remained in the hospital where he was treated by Dr. Sethi, an internist, whose testimony as to diagnosis, treatment and prognosis does not appear in the record. Mr. Cortazzo testified that Dr. Sethi continued to treat him for his injuries and sent him to numerous specialists. He also testified that his complaints of pain in the neck and head and voice failure were not present before the collision, began at the collision, and continued with temporary partial relief by therapy to the date of trial on July 20, 1994.

One of the specialists, Dr. Richard Fishbein, an orthopedist, testified that he first saw Mr. Cortazzo on February 7, 1991, at which time his complaint was neck and upper back pain and he was barely able to speak. Dr. Fishbein referred Mr. Cortazzo to specialists to treat the throat, and to a neurologist regarding numbness in hands. Later he referred Mr. Cortazzo to a rehabilitation center for treatment. His testimony includes the following:

A. Well, my diagnosis to him was a cervical radiculitis, or what I call a radiating pain due to nerve root irritation secondary to the whiplash type of injury that he sustained in the trauma.... [W]e sent him to physical therapy for a considerable length of time, probably up until January, uh,—probably up until March of 1993.... [W]here he went two or three times a

week and they did various modalities, including: uh, massage, ultrasound, traction, soft tissue releases. And surprisingly so, he did get considerably better as concerning the severe problem, the acute problem but he still had a consider[able] amount of lingering pain and spasms and problems to his both upper extremities and his neck area.

Now, in the course of the treatment I was, furnished an MRI, uh, what they call a, uh, magnetic imaging test, which was performed by Dr. Verne Allen, the results I have here in my hand, dated November 20th of 1990.

. . . .

A. An MRI is an imaging test which reconstitutes the vertebrae and the discs between the vertebrae, as well as its relationship to the spinal nerves which come from the spinal cord. And in his case, it showed that unbeknownst (sic) to Mr. Cortazzo at the time, that he had a considerable amount of problems, or breaking down of the bones with spurs, and narrowing of the spinal cord, what is known as stenosis, as well as some disc bulging in the mid-cervical area.

Q. Now, based upon your history taken from Mr. Cortazzo, had he had any neck problems prior to this auto accident?

A. No, sir.

Q. Is that particularly unusual that somebody could have these problems but have no symptoms?

A. No that's—that is not unusual. . . .

. . . .

So, in his case we have problems to all the various structures of his spinal canal: the vertebrae, the discs, the spinal nerves and the spinal cord. The spinal cord being narrowed in diameter, which is called stenosis, all which make for problems in his case.

Q. Okay. Now, based upon a reasonable degree of medical certainty, in your opinion what affect did this rear end collision have on these conditions that you've just described?

A. Well, it aggravated a pre-existing condition which he didn't even know he had, or even if he knew he had mild aches and pain, as most people have as they get older, uh, it aggravated to a point that it caused some permanent problems.

. . . .

[I]f your neck is dramatically altered by a whiplash injury which stretches the ligaments and alters the biomechanics causes considerable amount of problems. And finally, it shows a "disc bulge—mile", that is probably consistent with his age and not of any significance at all. With all of these taken in together, right, add up to a fact that he was predisposed not to respond as to conservative treatment as—as was given.

Q. Okay. Doctor, are the problems that you're seeing in Mr. Cortazzo now consistent with aggravation of those pre-existing conditions?

A. Yes, sir.

. . . .

Q. Doctor, let's go to the other type of injury that you have touched upon, and that's called the soft tissue part of this. If you would define for the Jury, what are the soft tissues you're talking about?

A. Well, the ligaments and the muscles of the cervical spine hold your neck erect in one position. Uh, when you have a soft tissue injury you have a stretching of the ligaments and the muscles, and what happens then, based on the severity of the injury, you have microscopic bleeding, just like is you bang a muscle that doesn't have to show up on any test and it heals with scar and a lot of times people end up with their neck in poor biomechanics. In other words, they sit forward, they hunch, uh, they don't straighten up correctly because it's more comfortable, although in the long run more, uh, to a disadvantage to hunch over. But most people who have soft tissue injuries find a position of hunching better, and that's why we send them to physical therapy basically because the only cure of this is basically correction of posture, which, again, reconstitutes the normal biomechanics of your neck and causes a decrease in the problems that he's having, namely headaches, occasional dizziness and pain.

. . . .

Q. Now, this soft tissue-the injuries to these soft tissues, can they be permanent?

A. Yes, sir.

Q. Okay. When they heal back how do they heal back?

A. Basically with stretching and scar tissue.

Q. Okay. Is that tissue as good as the original tissue?

A. No, sir.

. . . .

Q. . . . [W]hat, if any, injuries, in your opinion again based upon a reasonable degree of medical certainty, did he incur in regard to the pre-existing arthritis?

A. A significant aggravation of it.

Q. Okay. Doctor, again, based upon a reasonable degree of medical certainty, in your opinion what was the cause of these problems?

A. The automobile accident of October 15th of 1990.

. . . .

Q. Okay. Now, have you given him any restrictions in this activities or are there any restrictions he should follow that you would give him?

A. Well, his would be common sense restrictions since he's not working at this time. It would make sense and the restrictions should—that he shouldn't lift repetitively more than five to ten pounds at any time. Occasionally, he can lift twenty-five pounds to shoulder level. From waist level—from the floor to his waist he could lift forty-five pounds. But he needs to avoid overhead type of lifting; looking up any extended distances; driving any long periods of time, all these should be tempered.

Q. Mr. Cortazzo as a hobby at one time liked to restore cars. Would this have any affect, in your opinion, on his ability to do that type of work?

A. Yes, sir.

Q. Okay. Would it be consistent with the types of injuries he's incurred that he has problems with sleep, for example?

A. That would be very consistent with it, sir.

Q. Okay. And you've already mentioned headaches, so that's not surprising then if he has those?

A. No, sir.

Dr. Mark S. Courey a specialist in otolaryngology, testified in significant part as follows:

Q. Doctor, as a result of the history you took from Mr. Cortazzo and the fact that others in your clinic had seen him earlier and the tests that you ran, based upon a reasonable degree of medical certainty, did you then make a diagnosis of what was troubling or bothering Mr. Cortazzo?

A. At that point, it did not appear that Mr. Cortazzo had an intrinsic lesion of the larynx, that was a lesion that was present on the vocal folds themselves, such as a polyp or nodule or cancer which was accounting for his vocal difficulties.

The diagnosis then is functional dysphonia, because the beginning of the definition of functional dysphonia is what I stated, there is no intrinsic lesion, or lesion within the larynx.

Q. Doctor, based upon your examinations and these tests, did you reach an opinion based upon a reasonable degree of medical certainty as to what caused this functional dysphonia?

A. Again, in the history, vocal problems had started only after an automobile accident with significant—which resulted in significant neck pain. It was felt that the increased tension in the anterior neck or the muscles of the larynx and around the larynx were due to increased tension in the muscles around the spine.

. . . .

Q. Can you describe what effect, if any, the accident had on those muscles from your view of his injuries and treatment?

A. If the accident weakened the spinal column causing increased tension in this paraspinous muscles to help support the head, the—it would be necessary for the anterior cervical muscles to also increase their tension. And that then relates to the

increased tension inside the top half of the larynx which causes the vocal difficulty.

Q. Based upon a reasonable degree of medical certainty, do you have an opinion if that is what happened to Mr. Cortazzo?

A. Yes, I do.

Q. What is that opinion?

A. The opinion is that the spinal injury leading to increased tension in the paraspinous muscles led to increased tension in the anterior cervical muscles which led to the development of the weak voice.

. . . .

Q. In your opinion, based upon a reasonable degree of medical certainty, do you think Mr. Cortazzo will incur future medical bills or if he'll need further treatment to maintain his condition?

A. In my opinion, as his cervical spine condition waxes and wanes, he will have intermittent relapses into his muscle tension, or functional dysphonia, so he will need to attend physical therapy as well as speech therapy intermittently to help him relieve that cervical tension.

. . . .

Q. What is the prognosis for Mr. Cortazzo?

A. With regard to his voice, it's good. With continued intermittent physical and speech therapy on an as-needed basis, he would maintain an adequate voice.

Mr. Cortazzo was 62 years old at the trial. Although retired, at the time of his injury, he was active in his hobby of restoring antique automobiles. He testified that his activities had been curtailed and that he continued to suffer pain. Mr. Cortazzo's total medical expenses to the date of trial were shown to be $17,135.76.

Prior to the subject accident, Mrs. Cortazzo suffered a back injury in 1983, from which she apparently recovered after several weeks. Following the subject accident, she was treated and released from the hospital and did not seek further treatment until the following month. Dr. Fishbein treated her and, on March 7, 1991, released her to return to work. However, she testified that she continued to have pain "almost every day." Dr. Fishbein rated her retained disability at

5% as a result of the subject activity and estimated her future treatment needs at $1,000 per year for 5 to 10 years. Her total medical expenses to the date of trial were shown to be $4,481.52.

The complaint alleged $1,900 property damage, but appellants' brief states that this element of damages was settled before trial.

As stated above, the jury awarded Mr. Cortazzo $25,000 and Mrs. Cortazzo $10,000. Five of the issues on appeal relate to the jury charges.

Appellants' first complaint is that the Trial Judge failed to deliver "T.P.I. No. 14.10, Pain and Suffering, T.P.I. Instruction 14.11 expenses, and T.P.I. Loss of Earning Capacity."

Neither the record nor either brief indicates that there is a local rule or practice dispensing with the long standing rule of law that a special request for jury instructions must be a correct and complete statement of the law on the subject applicable to facts sustained by evidence.

It is presumed that the initials T.P.I. refer to a publication entitled "Tennessee Pattern Jury Instructions, Civil," Second Edition, prepared by The Committee on Pattern Jury Instructions, Civil, of the Tennessee Judicial Conference. With deference to the extensive efforts of those who prepared the publication, it bears no mark of approval by the Supreme Court or Legislature. Its text is doubtless helpful to bench and bar, but it claims no mandatory authority in respect to the instructions delivered by Trial Judges.

From time immemorial, Trial Judges have kept and used a file of "pattern jury instructions." The most efficient use of such a file is by keeping a supply of duplicates of various instructions so that a separate copy may be used in each case with suitable alterations. Tennessee Pattern Jury Instructions can best be utilized in similar fashion: by furnishing the Trial Judge with a separate copy of each desired instruction upon which appropriate alterations can be made to fit the case on trial.

T.P.I. Instruction 14.10 reads as follows:

## PAIN AND SUFFERING

Reasonable compensation for any physical pain and suffering suffered by the Plaintiff and which his or her injury was the proximate cause and for pain and suffering reasonably certain to be experienced in the future from the same cause.

No definite standard or method of calculation is prescribed by law by which to fix reasonable compensation for pain and suffering. Nor is the opinion of any witness required as to the amount of such reasonable compensation. In making an award for pain and suffering, you should exercise your authority with calm and reasonable judgment and the damages you fix shall be just and reasonable in the light of the evidence.

The complete charge on the subject of amount of damages was as follows:

If under these instructions you find that a plaintiff should recover, you will find and report what amount he or she should recover. This amount should be such sum not exceeding the amount sued for as the evidence shows will fairly and justly compensate him or her for said alleged wrongful infliction of injuries. In determining this sum or amount of just and fair compensation, you will take into consideration the nature and extent of the injury or injuries done to the plaintiff, whether of a permanent or temporary nature, the mental and physical pain and anguish inflicted upon him or her, the effect upon his or her capacity to labor and enjoy life, and the amount incurred for treatment in endeavoring to be cured.

. . . .

It's the duty of a person, ladies and gentlemen, who has been injured to mitigate his or her own damages by the use of reasonable diligence in caring for his or her injuries and reasonable means to prevent their aggravation and to accomplish healing.

When one does not use reasonable diligence to care for his or her injuries and they are aggravated as a result of that failure, the liability if any of another whose act or omission was the proximate cause of the original injury must be limited to the amount of damage that would have been suffered if the injured person had exercised the diligence required of him or her.

The mere fact that a competent physician advised an injured person to submit to a course of treatment or surgery does not require you to conclude that the injured person was negligent or unreasonable in declining that treatment or surgery. Other factors as they confronted the injured person must be considered in determining whether, although he or she refused to follow the physician's advice, he or she nevertheless exercised reasonable diligence for caring for himself or herself and injuries.

■ Appellants complain that the expression, "mental and physical pain and anguish *inflicted* upon him or her" restricts the jury's consideration to *past* pain and anguish and excludes future pain and anguish. This Court does not agree. The word "inflicted" (past tense) refers to the negligent act of defendant which occurred in the past. The expression, "injuries, whether of a temporary or permanent nature" includes effects of the negligent act, past, present and future.

■ Appellants next complain of the refusal of their request to charge T.P.I. 14.11 which reads as follows:

### T.P.I. 14.11

### EXPENSES

The reasonable value of medical care, services, and supplies reasonably required and actually given in the treatment of the plaintiffs as shown by the evidence and the present reasonable value of similar expenses reasonably certain to be required in the future.

Appellants argue that it was error to charge "the amount *incurred* for treatment" (past tense) without expressly authorizing consideration of cost of probable future treatment. The charge, quoted above, included the words, "incurred for treatment," but also the following:

"You should compensate him or her for loss or harm which is reasonably certain to be suffered by him or her in the future."

The latter quotation is broad enough to include expense of future treatment. A better description of future treatment would have been "reasonably probable" rather than reasonably certain. Nevertheless, the selection of words is not deemed error.

■ Appellants' next complaint is the refusal of their request to charge T.P.I. 14.13 as follows:

### T.P.I. 14.13
### LOSS OF EARNING CAPACITY

The value of earning capacity that has been lost in the past and will be reasonably certain to be lost in the future as a result of the injury in question.

Appellants insist that the words used in the above quoted charge of the Court, "the effect upon his or her *capacity to labor* and enjoy life." No argument or citation to the record supports this complaint. There is no evidence of employment of either of the plaintiffs except that they had a hobby of restoring antique automobiles and planned to charge $5,000 per vehicle for doing so. There is evidence that Mr. Cortazzo suffered a 10% impairment and Mrs. Cortazzo suffered a 5% impairment.

Appellants second request is an instruction that:

Loss and enjoyment of life compensates the victim for the limitations on the person's life created by the injury.

The charge given by the Trial Court and quoted above, included:

"the effect upon his capacity to labor and enjoy life."

Plaintiffs' second request also included the following:

Permanent impairment compensates the victim for the fact of being permanently injured whether or not it causes any pain or inconvenience; ... It may be argued that a Court should not award a person damages for a permanent injury which does not cause any pain and suffering or does not limit the victim's life in any way. But before the tortious conduct, the victim did not have the permanent injury. After the conduct the victim has been perma-

nently injured. The Court cannot make the victim whole by taking away the permanent injury—it can only award a monetary sum roughly equivalent to the severity of the permanent injury.

The charge delivered by the Trial Court, quoted above, included:

"take into consideration the nature and extent of the injury or injuries done to the plaintiff, whether of a permanent or temporary nature, the mental and physical pain and anguish inflicted upon him or her, the effect upon his or her capacity to labor and enjoy life ... and report the amount he or she should recover."

The foregoing include all of appellants' criticisms of the jury charge with the text of the charge under criticism.

■ Where the Trial Court correctly charges the law applicable to the case, it is not error to deny a special request that embodies a theory of a party if the court charges in general terms and with clearness sound propositions of law which would guide the jury in reaching a correct decision in the case. *Otis v. Cambridge Mut. Fire Ins. Co.*, Tenn.1992, 850 S.W.2d 439.

The charge as given by the Trial Judge was sufficient to cover the subjects presented by the plaintiffs' case in general, and in particular, the subjects of their special requests. The mere fact that the charge did not conform verbatim to the text requested by appellants would not create reversible error without a specific request for a supplementary explanatory charge. If appellants conceived that the wording of the charge was deficient or susceptible of misunderstanding, appellants were under a duty to point out the particular verbiage deemed inadequate and request substitutions or insertions to supply the perceived deficiency. *Forde v. Fisk University*, Tenn.App.1983, 661 S.W.2d 883.

*Employers Liability Assurance Corp. v. Farquharson*, 182 Tenn. 642, 188 S.W.2d 965 (1945), cited by appellants, states that an opinion must be restricted to the facts of the case in which it is rendered. That case was a suit upon an insurance policy the text of which narrowly confined the conditions of liability. The Trial Court first gave an erro-

neous charge on the limit of liability and later in the charge gave a correct instruction on the same subject. In this confused state of affairs, the Court declined a special clarifying request, and the Supreme Court reversed. The facts of the cited case are not consonant with those of the present case.

No reversible error is found in appellants' first issue.

■ Appellants' second issue asserts error in failure to instruct "T.P.I. 14.12, Medical Bill Presumption."

The technical record contains "Plaintiffs' Special Jury Instruction Request No. 1" which includes "T.P.I. No. 14.12, Medical Bill Presumption." The word "No" is written beside six of the requests, but not T.P.I. No. 14.12. The following handwritten note appears on the face of the request:

> Granted (illegible word) verbatim or in substance in general charge except 4.71 and 14.16 # 3 & 5 (illegible word) are inapplicable considering admission of liability by defendant. Gerald L. Ewell, Sr., Judge.

The transcript records the following relevant statements of the Trial Judge:

> ... Many of the special requests that Mr. Hedges has requested are included in my general charge normally. I don't know that they are specifically designated as T.P.I. Civil Number so and so, but in substance for the most part—I'll have to go through them one by one but my secretary is working on it right now. For the most part, they are either included in my general charge in substance or will be instructed as a matter of routine.

> . . . .

> ... Essentially everything you have requested, Mr. Hedges, is either in my general charge or I'll charge it anyway. Many of the things you have there I fashioned a different way and they state in substance what you have requested. There is nothing out of the ordinary in there....

As printed in Tennessee Pattern Jury Instructions Civil, Second Edition, No. 14.12 reads as follows:

T.P.I.—Civil 14.12

Medical Bill Presumption

In this case, some medical bills have been introduced in evidence. If these bills were paid or incurred by the plaintiff and do not exceed the sum of Two Thousand Five Hundred Dollars ($2,500.00), you are to find that these expenses were reasonable and necessary.

T.C.A. Section 24–5–113 reads as follows:

**Medical, hospital or doctor bills—Prima facie evidence of necessity and reasonableness.**—(a)(1) Proof in any civil action that medical, hospital or doctor bills were paid or incurred because of any illness, disease, or injury may be itemized in the complaint or civil warrant with a copy of bills paid or incurred attached as an exhibit to the complaint or civil warrant. The bills itemized and attached as an exhibit shall be prima facie evidence that the bills so paid or incurred were necessary and reasonable.

(2) This section shall apply only in personal injury actions brought in any court by injured parties against the person responsible for causing such injuries.

(3) This prima facie presumption shall apply to the medical, hospital and doctor bills itemized with copies of bills attached to the complaint or civil warrant; provided, that the total amount of such bills does not exceed the sum of two thousand five hundred dollars ($2,500).

(b)(1) In addition to the procedure described in subsection (a), in any civil action for personal injury brought by an injured party against the person or persons alleged to be responsible for causing the injury, if an itemization of or copies of the medical, hospital or doctor bills which were paid or incurred because of such personal injury are served upon the other parties at least ninety (90) days prior to the date set for trial, there shall be a rebuttable presumption that such medical, hospital or doctor bills are reasonable.

(2) Any party desiring to offer evidence at trial to rebut the presumption shall serve upon the other parties, at least forty-five (45) days prior to the date set for trial,

a statement of that party's intention to rebut the presumption. Such statement shall specify which bill or bills the party believes to be unreasonable. [Acts 1978, ch. 734, § 1; T.C.A., § 24–517; Acts 1981, ch. 481, § 1; 1989, ch. 235, § 1.]

It appears that appellants' request for instructions was limited to the $2,500 mentioned in Section 24–5–113(a)(3) and did not include the unlimited presumption provided by Section 24–5–113(b)(1).

Although the record contains medical bills of $17,135.76 for Mr. Cortazzo and $4,481.52 for Mrs. Cortazzo, it does not appear that any request was made for instruction regarding a presumption applicable to any amount in excess of $2,500, for each plaintiff. While the requested instruction appears to have been applicable, its omission was far less likely to be prejudicial than if the request had dealt with the full amount of the claims.

Moreover, it is questionable as to whether a Trial Judge should be reversed when he initially agrees to charge the substance of a requested instruction, but inadvertently overlooks charging one of a long list of requests. Under such circumstances fairness would require counsel to call attention to the oversight before the retirement of the jury to deliberate.

The transcript records that, at the conclusion of the charge, counsel for appellants requested a conference at the bench which was granted, and the following occurred:

Mr. Hedges: The consortium aspect goes both ways in the complaint.

The Court: Okay. I didn't realize that.

Thereupon the Bench conference was concluded and court proceeded as follows:....

The Trial Judge then delivered to the jury a comprehensive correction of this oversight.

No reason occurs to this Court why a similar correction would not have been made of the omission of T.P.I. 14.12 if called to the attention of the Court.

In view of the evidence of bills, the limitation of amount in the requested charge, the failure to call attention to the oversight and the amount of the verdicts rendered, this Court is unable to find that the oversight more probably than not affected the amount of the verdict. *See* T.R.A.P. Rule 36(b).

■ Appellants' third issue asserts error by instructing the jury that it could find a verdict for the defendants when liability had been admitted by defendants. The charge delivered to the jury included the following:

If you find from the evidence and believe from a preponderance of all the evidence that the damages occasioned to a plaintiff occurred as charged in the complaint, then it would be your duty to find in favor of the plaintiff and you should so report and report the amount you find in favor of the plaintiff not to exceed the amount sued for, $250,000 for Mr. Cortazzo and $75,000 for Mrs. Cortazzo is the upper limit which you may find. However, if a plaintiff has failed to prove by a preponderance of all the proof that a defendant was guilty of the matters charged in the complaint in one or more of the particulars charged therein or if under a consideration of all the proof, your minds be in equal balance as to the way and manner in which the damages occurred, then and in that event if you so find, your verdict should be in favor of the defendant....

... If you find that a plaintiff should recover, you will report in his or her favor and report the amount he or she should recover. If you find that he or she should not recover, you will report your verdict in favor of the defendant.

....

However, if you determine that a party is entitled to recover, you should compensate him or her for loss or harm which is reasonably certain to be suffered by him or her in the future as a proximate result of the injury in question.

In spite of the foregoing, at the conclusion of the charge, the Trial Judge stated to the jury:

... One question regarding who is at fault has already been answered for you here. It has been admitted by the defendants that they were at fault and you will see that this form has that portion already filled in, that Terry and Troy Blackburn

were 100 percent at fault in the matter....

The two references to a finding for the defendants were clearly an inadvertent use of an inapplicable "pattern instruction," which should have been called to the attention of the Trial Judge as was done in respect to consortium. Moreover, the inadvertence, as later corrected, did not induce the jury to find for the defendants.

It is theorized by appellants that the twice stated possibility of a verdict for the defendants tended to reduce the amount of damages allowed by the jury. This may be in the realm of possibility, but this Court is unable to find that, more probably than not, it affected the amount of the verdicts.

■ Deferring appellants fourth issue, their fifth issue is that the Court erred by instructing the jury on two occasions not to have sympathy. The offending sections of the charge are:

... As jurors, it is your exclusive duty to decide all questions of fact submitted to you and for that purpose to determine the effect and value of the evidence. You must not be influenced by sympathy, prejudice, or passion.

. . . .

You should not have sympathy for or prejudice against anyone, always keeping in mind that the object of your investigation is to seek and ascertain the truth. Your verdict should reflect the application of this instruction.

Both of the instructions were given early in the charge in connection with the general duties of the jury, and remote from any discussion of liability or amount of damages.

■ Generally, repetition of a legal principle does not invalidate a jury charge. *Boyd v. Hicks*, Tenn.App.1989, 774 S.W.2d 622.

The effect, if any, of the repetition under the circumstances, could readily have been removed by request to the Court as was done in regard to consortium.

This Court cannot find that this repetition, more probably than not, resulted in prejudice.

Returning to the deferred fourth issue, appellants insist that the charge, taken as a whole, was prejudicial to plaintiffs.

■ A jury charge must be considered as a whole to determine whether it contains reversible error. *Abbott v. American Honda Motor Co., Inc.*, Tenn.App.1984, 682 S.W.2d 206.

■ A charge will not be invalidated so long as it fairly defines the legal issues involved and does not mislead the jury. *Otis v. Cambridge Mutual Fire Ins. Co.*, Tenn.1992, 850 S.W.2d 439.

This Court has read and re-read the charge in the present case. Except for the inadvertences heretofore discussed, it fairly and correctly states the law. The inadvertences could readily have been remedied if called to the attention of the Court; and they did not individually or collectively, more probably than not, prejudicially affect the result.

Accordingly, no reversible error is found in the first five issues.

The sixth, and final issue of appellants is the alleged error in failing to suggest an additur.

■ Unquestionably, the Trial Judge has the authority to suggest an additur if a verdict of a jury is deemed by him to be inadequate. T.C.A. § 20–10–101(a). This authority is inherent in the power to set a verdict aside if he disagrees with it and to grant a new trial.

■ Where the jury's verdict is "not within the range of reasonableness," a Trial Court should suggest an additur or grant a new trial. *Wilkerson v. Altizer*, Tenn.App. 1992, 845 S.W.2d 744.

■ This Court does not have a corresponding power. It has the power to review and revise an additur suggested by a Trial Judge. T.C.A. Section 20–10–101(b)(2); but it has no power to suggest an additur after the Trial Court has refused to do so. *Loftis v. Finch*, Tenn.App.1972, 491 S.W.2d 370.

Even though the Court of Appeals is not satisfied with a verdict, it has no authority to suggest an additur to correct the failure of

the Trial Judge to do so. *Shaw v. Shofner,* Tenn.App.1978, 573 S.W.2d 169.

While the members Court might have favored a larger amount of damages if sitting as a jurors, or have suggested an additur if sitting as Trial Judge, they (the members of this Court sitting as such), have no authority to revise or attempt to revise the amount of the verdicts of the jury or the judgments rendered thereon.

The judgments of the Trial Court are affirmed. Costs of this appeal are taxed against appellant and their surety. The cause is remanded to the Trial Court for any necessary further procedure.

Affirmed and Remanded.

LEWIS and CANTRELL, JJ., concur.