IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 4, 2013 Session

# H. PRESTON INGRAM ET AL. v. SCOTT T. SOHR, INDIVIDUALLY AND AS TRUSTEE OF THE SCOTT T. SOHR FAMILY 2007 GRANTOR RETAINED ANNUITY TRUST ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 10725-II     Carol L. McCoy, Chancellor**

_____

**No. M2012-00782-COA-R3-CV - Filed July 31, 2013**

_____

This complex litigation arises out of a series of disputes between two former partners and members in more than twenty partnerships and limited liability companies that were in the business of real estate development. Following a tumultuous six year business relationship, in an attempt to extricate themselves from their business relationships, the parties executed a Membership Interest and Exchange Agreement, which distributed the entities so a portion were solely owned by one former partner/member and the others were solely owned by the other former partner/member. After closing on the Exchange Agreement, the plaintiff commenced this action against his former business partner alleging fraud, violation of the Tennessee Consumer Protection Act, breach of contract, breach of fiduciary duty, and fraudulent transfer of which most, but not all, of the claims arose from the Exchange Agreement. The complaint was later amended to add additional claims. The defendant filed a Counter-Claim alleging that the plaintiff was also in breach of the Exchange Agreement. The trial court dismissed several of the plaintiff's claims on summary judgment. The remaining issues were tried. At the close of the plaintiff's proof during the jury trial, the trial court granted a directed verdict in favor of the defendant on some, but not all, of the remaining claims. At the conclusion of the jury trial, the jury entered a verdict for the defendant on the remaining claims. Although the jury found the defendant in breach of three provisions of the Exchange Agreement and a partnership agreement of a jointly owned company, the jury awarded no damages based upon the plaintiff's prior knowledge and acquiescence of the breaches. Thereafter, each party sought to recover their respective attorney's fees pursuant to § 11(l) of the Exchange Agreement. The trial court held that defendant was the prevailing party; therefore, the trial court granted the defendant's motion to recover his attorney's fees pursuant to § 11(l) of the Exchange Agreement and awarded attorney's fees and costs to the defendant. The trial court also awarded the defendant indemnity under the bylaws of one corporation and the partnership agreement of another. The trial court also assessed discretionary costs against the plaintiff. On appeal, the plaintiff raises

numerous issues relating to the dismissal of his claims on summary judgment and directed verdict, the instructions given to the jury, the trial court's ruling on a post-trial motion to amend the defendant's answer, attorney's fees and costs, and indemnity. We affirm the trial court's rulings on summary judgment and directed verdict in all respects. We affirm the trial court's ruling on attorney's fees and costs under the Exchange Agreement, holding that as the trial court correctly determined the defendant was the prevailing party for those purposes. We also affirm the trial court's determinations that the defendant was entitled to indemnification under the provisions of the Partnership Agreement and indemnification under the bylaws of IS Investment, Inc.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, J.J., joined.

Eugene N. Bulso, Jr. and Steven A. Nieters, Nashville, Tennessee, for the appellants, H. Preston Ingram and IS Investment, Inc.

W. Scott Sims and Jason W. Callen, Nashville, Tennessee, for the appellees, Scott Sohr and SIS Development, LLC.

**OPINION**

H. Preston Ingram, the plaintiff, was introduced to Scott Sohr, the defendant, by a mutual business acquaintance in the early 1990's. Thereafter, the parties purchased and developed several parcels of real estate together. In 2003, the parties entered into their first partnership, Stonegate Land Company, that gave rise to this action. Following the formation of Stonegate, the parties created several other jointly owned business entities as they acquired real estate for development. Their general practice was that when a property was acquired, they formed a new entity, usually an LLC, to hold title to the property. By the end of the partnership, the parties jointly owned more than twenty entities that held title to more than twenty-five parcels of real estate. One of these entities was IS Investment, Inc., which is also a plaintiff in this action. IS Investment held a $20 million line of credit that the parties used to purchase other property. IS Investment, which also paid the expenses for other Stonegate companies, was housed in a building owned by Sohr on Trousdale Drive, and Sohr was responsible for the day to day management of the corporation. Another entity at issue was Prescott Land Investments, a general partnership owned by Ingram and Sohr.

The business relationship between Sohr and Ingram was terminated upon the closing of a Membership Interest Exchange Agreement ("Exchange Agreement") on July 8, 2009.[1] In the Agreement, the business entities jointly owned by Sohr and Ingram were transferred so that each party became the sole owner of specific entities.[2]

On April 28, 2010, following the closing of the Exchange Agreement, Ingram and IS Investment, Inc., commenced this action against Sohr, individually, and as Trustee of the Scott T. Sohr Family 2007 Grantor Retained Annuity Trust ("GRAT") asserting claims of fraud, violation of the Tennessee Consumer Protection Act, breach of contract, breach of fiduciary duty, and fraudulent transfer.[3] Thereafter, Ingram filed a First Amended Complaint adding an allegation that Sohr invalidated Ingram's title to a 2008 BMW Alpina; Ingram also sought a temporary injunction for the return of the title to the BMW from Sohr.[4] Sohr filed an Answer to the First Amended Complaint on June 28, 2010.

In January 2011, the trial court granted leave for Ingram to file a Second Amended Complaint wherein Ingram asserted additional claims of breach and sought a declaratory judgment on several issues. Sohr then filed a Counter-Claim seeking $21,710.908, for Ingram's alleged breach based upon the same legal argument as a breach alleged by Ingram. On March 28, 2011, Sohr filed a Third Party Complaint against Prescott Land Investments.

On October 15, 2010, Sohr filed his First Motion for Summary Judgment seeking summary dismissal of the claims against him. Following a hearing, the trial court granted the motion in part and denied the motion in part. The trial court summarily dismissed the following claims against Sohr: Fraud (Count I); violation of the Tennessee Consumer Protection Act (Count II);[5] any breach of fiduciary duty or fraud claims related to the Gladstone purchases referenced in the First Amended Complaint; any breach of fiduciary duty or fraud claims related to the Riverwatch purchase referenced in the First Amended Complaint; any breach of fiduciary duty or fraud claims related to the monetary distributions

---

[1]The partners had previously entered into a separation agreement in February 2009, however, due to the failure of several conditions precedent, the agreement did not go into effect.

[2]A small number of entities remained jointly held by both Ingram and Sohr, despite the deteriorating relationship between the parties.

[3]The complaint also named Paul Hineman as a defendant in the action for liability under a promissory note; Mr. Hineman is not a party to this appeal.

[4] The trial court granted the injunction requiring that Sohr return the title to the BMW to Ingram.

[5]The TCPA claim is not at issue in this appeal; and thus, we will not address this claim further in this opinion.

to Ingram & Sohr by IS Investment made in the First Amended Complaint; and any breach of fiduciary duty or fraud claims related to the monetary distributions made to Ingram and Sohr by SIS Development referenced in the First Amended Complaint. The trial court denied Sohr's motion for partial summary judgment on numerous other claims, announcing its reasoning for the grant or denial of summary judgment from the bench. The trial court's basis for dismissal of the fraud claim, which was based upon the alleged failure to disclose an appraisal by Thomas Fuller regarding one of the properties, was that there was no failure to disclose as Ingram and his agents were fully aware of the appraisal. Notably, while the trial court dismissed the majority of the fraud claims, the breach of contract claims relating to the same pieces of property, such as the Riverwatch property, survived.

Following the trial court's ruling, Sohr filed a motion to reconsider the trial court's summary judgment ruling, *inter alia,* the trial court's decision to not dismiss Ingram's claims that Sohr's transfer of assets to the GRAT constituted a fraudulent transfer. On May 3, 2011, the trial court granted the motion and entered an order dismissing the claim finding no genuine issue of material fact existed and the evidence established that Sohr received the reasonably equivalent value in the transfer at issue.

Ingram filed a Motion for Partial Summary Judgment on March 25, 2011, and thereafter, Sohr filed a Second Motion for Partial Summary Judgment. The motion by Sohr sought dismissal of the claims that: Sohr breached an implied agreement to leave the Atkins Note and Woodmont Receivable out of the Exchange Agreement, that Sohr breached § 7(l) of the Exchange Agreement, that Sohr breached the express warranty in § 7(n) of the Exchange Agreement, and that Sohr violated the Tennessee Securities Act of 1980 in connection with the Exchange Agreement transaction. Following a hearing, the trial court denied Ingram's motion in all respects and granted Sohr's motion in all respects. The trial court announced its reasoning for its grant of summary judgment from the bench. The trial court found that the claim related to § 7(l) of the Exchange Agreement based upon the allegation that Sohr failed to disclose a material contract in the form of a promissory note, was actually an error in the financial records, which should have been pursued under the Notice of Error provision of the Exchange Agreement and therefore Ingram had waived his right to pursue any action in regards to the promissory note. The trial court granted summary judgment on the claim for breach under § 7(n) on the finding that there was no evidence of materiality and thus the claim should be dismissed. The claim that Sohr breached an implied agreement to leave the Atkins Note and Woodmont Receivable out of the Exchange Agreement was summarily dismissed upon the finding that the parol evidence rule barred any evidence of an oral agreement as a matter of law.[6]

---

[6]The other claims addressed in the motions and order are not at issue in this appeal and therefore will

(continued...)

-4-

Ingram filed a Second Motion for Partial Summary Judgment on June 17, 2011, seeking dismissal of Sohr's Counter-Claim. Thereafter, on August 24, 2011, Sohr filed a Third Motion for Partial Summary Judgment. Following a hearing, the trial court entered an order stating the motions were to be held in abeyance.

Subsequently, Sohr filed a Motion to Revise the January 2011 order denying his Motion for Summary Judgment as to claims under § 7(k) of the Exchange Agreement. The following day, Ingram also filed a Motion to Revise. After a hearing on the competing motions, the trial court entered an Order on November 4, 2011, addressing its prior oral rulings as follows:

> The court denied Ingram's motion to revise.
>
> The trial court granted in part and denied in part Sohr's Third Motion for Summary Judgment, resulting in the dismissal of the following claims: Ingram's claims concerning the Renasant bank guaranty, the breach of fiduciary duty claims arising out of the allegations in paragraph 57 of the Second Amended Complaint, which listed numerous alleged instances of malfeasance, and Ingram's breach of warranty claims under § 7(n) of the Exchange Agreement based upon the allegations set forth in paragraph 57 of the Second Amended Complaint.
>
> As for the Renasant bank guaranty, the trial court found that the released obtained by Sohr satisfied his obligation under the Agreement.
>
> The trial court also granted in part and denied in part Sohr's Motion to Revise the ruling on the breach of warranty claim under § 7(k) of the Exchange Agreement resulting in the dismissal with prejudice as to all liabilities that Ingram contended Sohr failed to list on Schedule C of the Exchange Agreement except for 4 liabilities: 1) the alleged $34,000 liability of Harvey Development, LLC relating to the Berkshire Walking Trail; 2) the alleged $111,100 liability of Hood Developments, LLC to Don Martin; 3) the alleged $397,783 liability of Tims Ford Development, LLC to Holiday Landing Marina regarding boat

---

[6](...continued)
not be elaborated upon in this opinion.

slips, and 4) the alleged $542,117 liability of Tims Ford North Development, LLC to Holiday Landing Marina regarding boat slips. The trial court found that Ingram had knowledge of the liabilities because the liabilities were disclosed on financial statements provided to Ingram.

Lastly, the order granted Ingram's Second Motion for Partial Summary Judgment on Sohr's Counter-Claim, which alleged Ingram had breached the warranty contained in § 6(k) of the Exchange Agreement.

On November 7-16, 2011, a trial was held before a jury on the remaining claims. On November 14, at the close of Ingram's proof, Sohr moved for a directed verdict as to all of Ingram and IS Investment's claims against him; the trial court granted a directed verdict as to one claim. Sohr renewed his motion at the close of his proof. Ultimately, the trial court granted a directed verdict to Sohr on three claims: Sohr's alleged failure to disclose a liability of Harvey Developments, LLC on Schedule C of the Exchange Agreement;[7] Ingram's claim that a liability of $97,203 for Bugg Hollow was mistakenly allocated to him at closing; and IS Investment's claim that Sohr breached his fiduciary duty by improperly using resources of IS Investment. On the Harvey Developments claim, the trial court found that there was no liability because the letter from Sohr to the mayor of Spring Hill did not create a contract obligating the building of the Belshire walking trail. On the Bugg Hollow claim, the trial court found that Sohr was not responsible for the creation of the Agreement and that both parties were represented by attorneys during the negotiations, who reviewed the Exchange Agreement and attached documents. The trial court found the breach of fiduciary duty claim was barred by the applicable statute of limitations.

On November 15, 2011, the trial court instructed the jury, and the following day the jury returned its verdict. The jury found for Ingram on the claim for the ownership of the BMW Alpina automobile, awarded $9,750 for the cost of the airline miles given by Ingram to Sohr that were not repaid, and found that the purchase of the Riverwatch property violated the Partnership Agreement of Prescott Land Investments but found that Ingram had acquiesced in the purchase; thus the trial court dismissed the claim. The jury further found that Sohr breached his warranty in section 7(k) of the Exchange Agreement by not listing the four remaining liabilities at issue on Schedule C, but found that Ingram had knowledge of the liabilities when the Exchange Agreement was executed; based upon this finding by the jury, the claim was dismissed by the trial court. The jury also found that Sohr did not cause IS

---

[7]Ingram received Harvey Developments, LLC, in the division of the corporations under the Exchange Agreement. The liability that Sohr allegedly failed to disclose was the "Belshire walking trail."

Investment to pay salary or overhead expenses in violation of any agreement with Ingram. The jury additionally found that a mistake was made in the amount of $24,703 made in connection with a $790,000 Promissory Note executed by RC Properties and that Sohr was obligated to pay 42.5% (not 50%) of the Promissory Note. Lastly, the jury found that Ingram was entitled to receive $11,478.65 from $74,835.69 in funds held in escrow, with Sohr to receive the balance. The Judgment Order was entered on December 7, 2011.

Following the trial, on January 6, 2012, Ingram filed a Tennessee Rule of Civil Procedure 59 motion to alter or amend, or in the alternative, a motion for new trial. Ingram also filed a motion for discretionary costs pursuant to Tennessee Rule of Civil Procedure 54.04 and a motion for attorney's fees based upon Section 11(l) of the Exchange Agreement. Thereafter, Sohr filed a motion for discretionary costs and attorney's fees. A hearing occurred, following which the trial court entered an order denying Ingram's Rule 59 motion to alter or amend in all respects. Ingram filed a Third Motion to Revise under Rule 54.02 seeking the trial court's reversal of its prior summary judgment rulings in favor of Sohr, which the trial court denied.

On March 7, 2012, Sohr filed a Motion to Amend his Answer pursuant to Tennessee Rule of Civil Procedure 15.02 to add the affirmative defense of acquiescence, which the trial court granted. Stating its reasons from the bench, the trial court found that Ingram had "acquiesced by his conduct throughout the entire trial" and thus the issue had been tried by express or implied consent throughout the trial.

A hearing on the issue of attorney's fees occurred on March 22, 2012. Thereafter, on May 1, 2012, the trial court issued a Memorandum and Order denying Ingram's motion for attorney's fees and costs. On the issue of attorney's fees recoverable under § 11(l) of the Exchange Agreement, the court found that Ingram was the prevailing party only as to four claims, three of which were unrelated to the Exchange Agreement. As for the remaining claim regarding the Schedule C liabilities, the jury found that there were no damages, thus the court found Ingram was not the prevailing party and therefore he was not entitled to attorney's fees. The trial court found that Sohr, however, was the prevailing party on the vast majority of the claims for breach of fiduciary duty, warranty, representation, and others that were alleged pursuant to the Exchange Agreement and therefore was entitled to attorney's fees and costs.[8] The trial court further found that Sohr was entitled to indemnification of his legal fees and expenses from two entities: IS Investment, based upon a provision in its bylaws, and by Prescott Land Investments, based upon a provision in the Partnership Agreement. The court also awarded Sohr $24,348.84 of allowable discretionary costs pursuant to Tennessee Rule of Civil Procedure 54.

---

[8]The court reserved the issue of the amount of attorney's fees recoverable.

Following the trial court's decision, Ingram filed a Motion to Revise and Recuse requesting that the trial court reverse its ruling on attorney's fees and costs, and seeking the trial court's recusal based upon evidence of unfair bias towards Sohr. Following a hearing, the trial court entered an Amended Memorandum and Order revising its previous ruling on attorney's fees and costs, which revisions are not material to this appeal, and in effect denying Ingram's Motion to Revise and Recuse, although the order did not address the issue of recusal. On June 25, 2012, a hearing on discretionary costs occurred and thereafter, the trial court entered an order resolving any remaining issues regarding discretionary costs and attorney's fees. The order awarded Sohr $696,311.77 in attorney's fees. Thereafter, Ingram filed a timely appeal.

## ANALYSIS

On appeal, Ingram raises numerous issues relating to the various stages of litigation in this action and the trial court's decisions as they relate to those stages. Sohr also raises one issue on appeal relating to the dismissal of his counter-claim against Ingram and requests his attorney's fees incurred on appeal. We shall address each issue in turn.

### I. CLAIMS DISMISSED ON SUMMARY JUDGMENT

Ingram argues on appeal that the trial court erred in denying his motion for summary judgment on his breach of contract claim against Sohr under section 7(k) of the Exchange Agreement. He further argues that the trial court erred in granting summary judgment to Sohr and dismissing Ingram's claims for breach under sections 7(k), 7(l), and 7(n) of the Exchange Agreement, breach of the Guaranty and Indemnification Agreement, breach of contract relating to the Atkins Note and Woodmont Receivable, and the claim relating to Sohr's transfer of assets to the Grantor Retained Annuity Trust.

Sohr argues on appeal that if this court reverses the grant of summary judgment to Sohr on the issue of breach of warranty under section 7(k) of the Exchange Agreement, then the court must also reverse the trial court's dismissal of his Counter-Claim against Ingram as it was based upon the identical warranty contained in section 6(k) of the Exchange Agreement.

### A. Standard of Review

Summary judgment is appropriate when a party establishes that there is no genuine issue as to any material fact and that a judgment may be rendered as a matter of law. Tenn. R. Civ. P. 56.04; *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). The party seeking summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that the party is entitled to judgment as a matter of law. *Godfrey v. Ruiz*, 90

-8-

S.W.3d 692, 695 (Tenn. 2002). To be entitled to summary judgment, the moving party must affirmatively negate an essential element of the nonmoving party's claim *or* show that the moving party cannot prove an essential element of the claim at trial. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008).

Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). Because the resolution of a motion for summary judgment is a matter of law, we review the trial court's judgment de novo with no presumption of correctness. *Martin v. Norfolk Southern Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) The appellate court makes a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1977). As does the trial court, the appellate court considers the evidence in the light most favorable to the nonmoving party and resolve all inferences in that party's favor. *Martin,* 271 S.W.3d at 84; *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003); *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, the appellate court first determines whether factual disputes exist. If a factual dispute exists, the court then determines whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn.1993).

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. A properly supported motion for summary judgment must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998). If the moving party makes a properly supported motion, then the nonmoving party is required to establish the existence of the essential elements of the claim. *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215. If, however, the moving party does not properly support the motion, then the nonmoving party's burden to produce either supporting affidavits or discovery is relieved and the motion must fail. *McCarley*, 960 S.W.2d at 588; *Martin*, 271 S.W.3d at 83.

To make this showing and shift the burden of production, a moving party may: 1) affirmatively negate an essential element of the nonmoving party's claim; or 2) show that the nonmoving party cannot prove an essential element of the claim at trial. *Martin*, 271 S.W.3d at 83; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008); *Byrd*, 847 S.W.2d at 215 n.5. Whichever approach the moving party takes, both require more than assertions of the nonmoving party's lack of evidence. *Martin*, 271 S.W.3d at 83-84. In addition, the moving party must present evidence that more than "raises doubts" about the ability of the nonmoving

party to prove its claim at trial. *Id.* at 84. The moving party must produce evidence or refer to previously submitted evidence. *Id.*; *accord Hannan*, 270 S.W.3d at 5. Thus, to negate an essential element of a claim, a moving party must refer to evidence that tends to disprove an essential element of the claim made by the nonmoving party. *Martin*, 271 S.W.3d at 84.

### B.  Breach of Sections 6(k) & 7(k) in the Exchange Agreement

Section 7(k) of the Exchange Agreement provided a warranty by Sohr that: "Except as listed on Schedule C hereto, to the best of Sohr's knowledge none of the Sohr Transferred Companies has any liabilities, whether accrued, absolute, contingent or otherwise, that are greater than $5,000 either individually or in the aggregate." An identical warranty made by Ingram to Sohr was contained in § 6(k) of the Exchange Agreement.

It is undisputed that both parties knew that the Sohr Transferred Companies and the Ingram Transferred Companies had numerous liabilities in excess of $5,000; nevertheless, neither Ingram nor Sohr listed any liabilities on Schedule C. In fact, all that is stated on Schedule C is the word "none" as it pertains to all companies transferred by each party to the other.

In his Second Amended Complaint, Ingram alleged that Sohr was in breach for his failure to list liabilities in excess of $6 million on Schedule C.[9] In his Counter-Claim, Sohr alleged that Ingram failed to list over $20 million in liabilities on Schedule C.[10] Ingram also asserted claims related to contingent liabilities.

---

[9]These liabilities were: (1) a $397,783 liability of Tims Ford Development, LLC for boat slips at Holiday Landing Marina on Tims Ford Lake; (2) a $542,117 liability of Tims Ford North Development, LLC for boat slips at Holiday Landing; (3) a $1,000,000 note payable by King Development, LLC to Ingram's attorney, Tommy Sidwell; (4) a $65,280 liability of Hood Development, LLC to Celebration Homes for earnest money deposits; (5) a $95,875 liability of Hood Development, LLC to Mike Ford Homes for earnest money deposits; (6) a $49,400 liability of Hood Development, LLC for amenity fees associated with the sale of lots in the Canterbury subdivision; and (7) a $6,111 liability of Hood Development, LLC to Don Martin for Commissions. Later, in a Motion in Limine, Ingram alleged that these liabilities also included a $3.6 million contingent liability of Hood Development, LLC for the construction of future amenities in the Canterbury Development, a $34,300 contingent liability for the construction of a walking trail in the Belshire development, and increased the Don Martin liability to $111,104 and the Sidwell note to $1,250,000.

[10]Sohr maintained, however, that he was asserting the counter-claim as a protective measure and believed that neither party was actually in breach as both parties were aware of the liabilities prior to entering into the Exchange Agreement as the liabilities were disclosed on financial statements that each party was provided prior to their entry into the Exchange Agreement.

The trial court granted summary judgment to Sohr and denied Ingram's motion for summary judgment on Ingram's claims for breach of section 7(k) for failure to list on Schedule C on all but four liabilities, based upon the determination that Ingram had knowledge of the liabilities at the time he entered into the Exchange Agreement because these liabilities were disclosed on financial statements provided to Ingram.[11] The trial court granted summary judgment to Ingram on Sohr's alleged counter-claim based upon the same reasoning. The trial court also dismissed Ingram's claim for a liability related to the Canterbury Development without reaching the issue of knowledge, upon the holding that there was no evidence in the record that there was a contractual obligation for the alleged liability, and that there was no evidence Ingram suffered any damage as a result of this alleged liability or would be subject to any damage in the foreseeable future.

On the claims dismissed based upon Ingram's prior knowledge, the trial court looked to § 8(b) of the Exchange Agreement. Section 8 of the Agreement is entitled "Indemnification; Survival." Section 8(b) provides:

> Sohr shall hold harmless and indemnify Ingram from and against any reasonable loss, damage, liability, or deficiency in the aggregate greater than $25,000 (the indemnification shall include, without limitation, attorneys' fees and other reasonable costs and expenses incident to any claim, suit, action, investigation or other proceeding but such amounts shall not be considered when determining the floor amount of $25,000) arising out of or resulting from, and will pay Ingram on demand the full amount of any sum which Ingram may pay or become obligated to pay on account of (i) any inaccuracy in any representation or the breach of any warranty made by Sohr hereunder, or (ii) any breach of any covenant or obligation in this Agreement. In addition, Sohr shall indemnify and hold harmless Ingram from, for and against, any costs and expenses, including attorneys' fees, which Ingram may suffer or sustain in seeking to enforce the indemnification obligations of Sohr hereunder. ***Notwithstanding the foregoing, Sohr shall not be liable under this Section 8 with respect to any damages arising out of or related to matters within the knowledge of Ingram as of the Effective Date.***

On appeal, Ingram argues that the trial court's ruling was erroneous based upon the language contained in § 8(c) of the Exchange Agreement. Section 8(c) states that:

---

[11]The four liabilities that survived were the Tims Ford liability for the boat slips, the Tims Ford North Development liability for boat slips, the Don Martin liability, and the Belshire walking trail liability.

Except as provided below, all representations, warranties, covenants and obligations in this Agreement shall survive the consummation of the transactions contemplated hereby for a period of two (2) years from the Closing Date. The right to indemnification, reimbursement or other remedy based upon such representations, warranties, covenants and obligations shall not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time with respect to the accuracy or inaccuracy of or compliance with any such representation, warranty, covenant or obligation.

In his argument, Ingram acknowledges that he received the financial statements, which contained the liabilities that he claims Sohr failed to list on Schedule C of the Exchange Agreement, which he argues results in a breach of the warranty contained in § 7(k). However, he argues that based upon § 8(c), such knowledge is irrelevant. He further argues that § 8(b) is not relevant to his claims for breach of warranty against Sohr.

There are no disputed facts regarding the failure to disclose the liabilities on Schedule C that were resolved on summary judgment on the issue of knowledge. This issue rests solely upon the interpretation of the provisions contained within the Exchange Agreement. The interpretation of a contract is a question of law. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Issues as to interpretation and application of unambiguous contracts are likewise issues of law, the determination of which enjoys no presumption of correctness on de novo appellate review. *Doe v. HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Angus v. W. Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). Therefore, the trial court's interpretation of a contract is not entitled to a presumption of correctness under Tennessee Rule of Appellate Procedure 13(d) on appeal. *Angus*, 48 S.W.3d at 730. Accordingly, we will review the contractual issues de novo and reach our own independent conclusions regarding their meaning and legal import. *Guiliano*, 995 S.W.2d at 95; *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

"The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles." *Rainey v. Stansell*, 836 S.W.2d 117, 118-19 (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975)). A primary objective in the construction of a contract is to discover the intention of the parties from a consideration of the whole contract. *McKay v. Louisville & N. R. Co.*, 182 S.W. 874, 875 (Tenn. 1916). When resolving disputes concerning contract interpretation, we are to ascertain the intention of the parties based upon the "usual, natural, and ordinary meaning" of the contractual language. *Rainey*, 836 S.W.2d at 119. "All provisions in the contract should be construed in harmony with each other, if possible, to

promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano*, 995 S.W.2d at 95 (citing *Rainey*, 836 S.W.2d at 118-19).

The court, at arriving at the intention of the parties to a contract, does not attempt to ascertain the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written. *Rainey*, 836 S.W.2d at 118-119 (citing *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526 (Tenn. Ct. App. 1981)). Where there is no ambiguity in the contract language, neither party is to be favored in the construction of the contract. *Ballard v. N. Am. Life & Cas. Co*., 667 S.W.2d 79, 83 (Tenn. Ct. App. 1983). "The language of a contract is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way." *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994) (citing *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). "A strained construction may not be placed on the language used to find ambiguity where none exists." *Id*. (quoting *Farmers-Peoples Bank*, 519 S.W.2d at 805). "An ambiguous provision in a contract generally will be construed against the party drafting it." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006) (citing *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968); *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003)).

Ingram argues that § 8(b) is inapplicable because it only applies to indemnity or recovery, and since he did not "pay or become obligated to pay" a third party, it cannot be used to excuse liability for Sohr's failure to list the liabilities on Schedule C. We find this interpretation by Ingram in clear conflict with the plain language of the last sentence of § 8(b), which states: "Notwithstanding the foregoing, Sohr *shall not be liable under this Section 8* with respect to any damages arising out of or related to matters within the knowledge of Ingram as of the Effective Date*." In contrast, § 8(c), by its plain language, applies to matters not within the knowledge of either Ingram or Sohr upon entry into the contract, but states that knowledge *acquired* or *capable of being acquired* does not affect a claim for the two-year period following the consummation of the transactions in the Exchange Agreement. We hold that Section 8(b) bars Ingram's claims for breach of warranty based upon Sohr's failure to disclose the liabilities contained at Schedule C at issue on summary judgment because Ingram had undisputed knowledge of such liabilities on the financial statements provided to Ingram as far back as March 2009. Thus, Ingram is not entitled to recovery for any damages as the liabilities not disclosed on Schedule C were within his knowledge. Therefore, we affirm the trial court's denial of Ingram's motion for summary judgment as to the breach of § 7(k), the trial court's grant of summary judgment to Sohr on the claims that he breached §7(k) and the resulting dismissal of those claims, and the trial court's grant of summary judgment to Ingram on Sohr's counter-claim for breach of § 6(k).

## C. Canterbury Development

Ingram asserted a claim that Sohr breached § 7(k) by failing to disclose an alleged contingent liability to construct future amenities in the Canterbury Development, which was owned by Hood Development, LLC, one of the Sohr Transferred Companies. The basis for Ingram's claim was that neighborhood amenities were promised to residential lot purchasers in the Canterbury Development. The trial court also summarily dismissed Ingram's Canterbury Development claim. Ingram insists this was error; we find no error with this decision.

There was no contractual obligation to build such amenities, but Ingram argued that because the purchasers could potentially file suit under a promissory estoppel theory, Sohr should have disclosed the cost of the amenities, which he argues was approximately $3,686,985. Sohr contends that the trial court properly granted summary judgment on this claim because there was no evidence that the alleged promises of amenities was a "contingent liability" as contemplated in the Exchange Agreement, that the undisputed facts showed the representations were made, not by employees of Hood Development, but by employees of Mike Ford Homes, and further that marketing materials of the Canterbury Development contained disclaimers, which provided: "The developer reserves the right to modify this plan at its sole discretion," and "subject to change without notice or cause" thus providing further support that the statements regarding amenities did not give rise to a contingent liability for Hood Development that should have been disclosed on Schedule C pursuant to § 7(k).

As the trial court noted, it was undisputed that there was no contractual obligation by Hood Development to build the amenities in the Canterbury Development. Ingram's tenuous argument that he could at some point be liable in the future for residents who decided to bring a lawsuit on a theory of promissory estoppel is not sufficient to establish a contingent liability subject to disclosure under the Exchange Agreement. Further, there is no evidence in the record that Hood Development had any obligation whatsoever to build such amenities. We, therefore, affirm the summary dismissal of Ingram's claim that Sohr breached § 7(k) of the Exchange Agreement.

## D. Breach of Section 7(l) of the Exchange Agreement

Ingram alleged that Sohr breached § 7(l) of the Exchange Agreement by failing to list on Schedule D all "material contracts" of any Sohr Transferred Company, specifically a Memorandum of Understanding that King Development, LLC, executed in favor of Bill Charles, which cancelled Mr. Charles's obligation to pay a Promissory Note of $160,000.

Section 7(l) of the Exchange Agreement states that: "Except as listed on Schedule D hereto, to the best of Sohr's knowledge none of the Sohr Transferred Companies are bound by or a party to any material contracts, leases, instruments or commitments, whether written or verbal."

In Ingram's Second Amended Complaint, Ingram asserted a fraud claim related to the Promissory Note in which he asserted that he was unaware of the Memorandum of Understanding, which forgave the $160,000 Promissory Note. However, the proof demonstrated that the Memorandum of Understanding was clearly documented in the corporate records and known to Ingram's agents and employees of IS Investment and thus the claim was dismissed by the trial court on summary judgment.[12] Thereafter, Ingram changed his theory regarding the Promissory Note to a claim for breach of warranty under § 7(l) of the Exchange Agreement.

The trial court granted summary judgment to Sohr on the breach of warranty claim on the basis that Ingram had failed to comply with the Notice of Error provision in Section 9 of the Exchange Agreement, which provided that each party had one year from the effective date to deliver a written notice of errors to the other party regarding any material errors or omissions in the books of account or other financial records of the companies for amounts greater than $25,000. In each notice of error, the party was required to specify in reasonable detail the nature of any error asserted and the amount owed by the other party. The trial court found that Ingram provided timely notice of errors to Sohr on July 6, 2010; however, the court also found that the Memorandum of Understanding forgiving the $160,000 Promissory Note was listed as an error. In so finding, the trial court rejected the argument that Ingram had generally asserted this error noting that the provision required "reasonable detail" of the nature of the error and there was no reference to the Memorandum of Understanding. Thus, the trial court found that Ingram was barred under Section 9 of the Exchange Agreement from now asserting such an error as he did not comply with the procedure set forth for correction of errors in the Exchange Agreement.

Ingram argues in this appeal that the Memorandum of Understanding was a material contract that should have been listed on Schedule D pursuant to § 7(l) of the Exchange Agreement and therefore was a breach of that warranty. In his brief, Ingram argues that the trial court erred in treating this as an issue that fell within the Notice of Error provision regarding financial records arguing that "this was beside the point." We disagree.

The Memorandum of Understanding was drafted as part of a deal that occurred in October 2007 between King Development and Bill Charles, in which a lot owned by King

---

[12]The dismissal of this fraud claim on summary judgment is not an issue in this appeal.

Development in the King's Crossing subdivision was exchanged for services Charles had previously provided in connection with several other development properties. The deal was negotiated by IS Investment. The deal was structured so that Charles would sign a promissory note in the amount of $160,000, and that note would be forgiven by King Development, a procedure recommended by Larry Mullins, Ingram's tax accountant. The Memorandum of Understanding noted that "the Parties agree that the purchase of this Lot has been fully settled and no outstanding monies are due to King Development, LLC from Bill Charles." Despite this, King Development continued to list the $160,000 Promissory Note on its balance sheet continuing through the time of the Exchange Agreement. Clearly, this circumstance falls within the Notice of Error Provision contained in the Exchange Agreement as the Promissory Note should have been taken off the balance sheet of King Development long before the execution of the Exchange Agreement and that the listing of the Promissory Note was an error in the financial records of King Development.

Thus, we affirm the trial court's rulings that the Notice of Error Provision applied and that Ingram's failure to list this material error on his written notice of error with reasonable detail waived his right to a remedy; therefore, we affirm the trial court's dismissal of this breach of warranty claim as a matter of law.

### E. Breach of Section 7(n) of the Exchange Agreement

Ingram also alleged that Sohr breached Section 7(n) of the Exchange Agreement by his failure to provide written notice of a valuation of the Canterbury Development by Thomas Fuller. On appeal, Ingram argues that the trial court's dismissal of the claim on summary judgment was in error as it invades the province of the jury.

Section 7(n) of the Exchange Agreement provides that:

There are no other facts of which Sohr has knowledge which have or will have a material adverse effect on the development of any of the property owned by the Sohr Transferred Companies or the valuation of any of the Sohr Transferred Interests, and have not been disclosed in writing to Ingram.

As with several other claims, Ingram initially alleged that he was fraudulently induced into entering into the Exchange Agreement by Sohr's failure to inform him of several property valuations prepared by Thomas Fuller. Following proof that Ingram and his agents were aware of the Fuller valuations, the fraudulent inducement claims were dismissed. Ingram then argued that one of the valuations performed by Fuller on the Canterbury Development constituted a breach of § 7(n) because it had a material adverse effect on the valuation of the Canterbury Development and it was not disclosed to him in writing.

The trial court dismissed this claim on summary judgment finding that there was no evidence of materiality in the record. Ingram argues that materiality is a question for the jury and thus the trial court's ruling and subsequent dismissal of this claim was erroneous. Sohr argues, however, that the valuation does not fall within the scope of § 7(n) as a matter of law because there was no evidence of materiality other than conclusory statements and allegations, which were insufficient to defeat his properly supported motion for summary judgment. Sohr argues that the valuation was essentially meaningless to the Exchange Agreement and was in fact prepared at the behest of Ingram's agent to minimize the tax consequences to Ingram. Further, Sohr argues that even if the valuation by Fuller did fall within § 7(n)'s scope, Ingram's claim based upon this would be barred by his prior knowledge under § 8(b), and the claim is deficient because Ingram has shown no injury associated with this alleged breach.

As with the claim for breach of warranty under § 7(k) of the Exchange Agreement, we hold that Ingram's prior knowledge of the Fuller valuation bars his recovery for damages based upon § 8(b), which provides that "Sohr shall not be liable under this Section 8 with respect to any damages arising out of or related to matters within the knowledge of Ingram as of the effective date." The evidence demonstrated that Ingram and his agents were aware of the Fuller valuations and in fact that the Fuller valuations were prepared at the behest of Ingram for the purposes of maximizing his anticipated tax loss from the Exchange Agreement transaction. In fact, Tommy Sidwell, who was employed by Ingram, hired Fuller to achieve a low valuation. Thus, Ingram's knowledge was not only that the valuations occurred but also that they were to be lower for tax purposes. Accordingly, we affirm the trial court's decision to dismiss this claim on summary judgment, although on different grounds. *City of Brentwood v. Metropolitan Bd. of Zoning Appeals*, 149 S.W.3d 49, 60 n.18 (Tenn. Ct. App. 2004) ("The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result.").

### F.  Atkins Note and Woodmont Receivable

Another claim dismissed by the trial court on summary judgment was a breach of contract claim by Ingram that Sohr breached an oral agreement between Sohr and Ingram that assets owned by SIS, a company which following the Exchange Agreement was solely owned by Sohr, were to be transferred out of SIS before the Exchange Agreement was consummated.[13]

---

[13]These assets are referred to as the "Woodmont Receivable," which consists of funds loaned and interest charged on a loan that SIS made to Woodmont Development, LLC, another company of Ingram and Sohr, which amounts to $573,726, and the "Atkins Note," which is a $702,000 promissory note given to SIS by a home builder as part of the payment for lots purchased from SIS.

This claim was originally fashioned as a fraud claim by which Ingram asserted that he was unaware that the two assets existed prior to entering into the Exchange Agreement. Following evidence that the two assets were listed on the March 31, 2009 balance sheet of SIS, which was prepared by IS Investment, whose President was Ingram, the fraud claim was dismissed on summary judgment.[14] Ingram then morphed the claim by asserting that an oral agreement existed that the only material asset to be in the possession of SIS Development at the time of the closing of the Exchange Agreement were lots in the Courtside Development, and that the Woodmont Receivable and the Atkins Note were not to be included in the company received by Sohr. The Exchange Agreement provided that Sohr was to receive 100 percent ownership of SIS Development, LLC.

The trial court summarily dismissed the breach of contract claim finding that the parol evidence rule barred any evidence of an oral agreement as a matter of law. Ingram argues on appeal that the trial court's ruling was erroneous because evidence of a contemporaneous oral agreement that does not contradict the terms of a written agreement is admissible. Ingram argues that the oral agreement does not contradict the terms of the Exchange Agreement, which "merely omits reference to it." Ingram contends that his affidavit, and the statement of his agent, Sidwell, demonstrate that there was a contemporaneous agreement that the Atkins Note and Woodmont Receivable were to be transferred out of SIS Development prior to the execution of the Exchange Agreement.

"The parol evidence rule is a rule of substantive law intended to protect the integrity of written contracts."*GRW Enterprises, Inc. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990) (citing *Maddox v. Webb Constr. Co.*, 562 S.W.2d 198, 201 (Tenn. 1978)). The parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract. *Id*. (citing *Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn. 1985); *Clayton v. Haury*, 452 S.W.2d 865, 867 (Tenn. 1970)). This rule recognizes that generally "courts should not look beyond a written contract when terms are clear." *Id*. (citing *Newark Ins. Co. v. Seyfert*, 392 S.W.2d 336, 348 (Tenn. 1964)).

There are exceptions to the parol evidence rule, however, which the court in *GRW Enterprises* elaborated upon:

> [T]he rule does not prevent using extraneous evidence to prove the existence of an agreement made after an earlier written agreement, *Brunson v. Gladish,* 174 Tenn. at 316, 125 S.W.2d at 147; *Bryan v. Hunt*, 36 Tenn. (4 Sneed) 543, 547–48 (1857); *Trice v. Hewgley*, 53 Tenn. App. 259, 267–68, 381 S.W.2d 589, 593 (1964), or to prove the existence of an independent or collateral agreement

---

[14]The dismissal of this claim is not at issue in this appeal.

not in conflict with a written contract. *McGannon v. Farrell*, 141 Tenn. 631, 637, 214 S.W. 432, 433 (1919); *Isabell v. Aetna Ins. Co.*, 495 S.W.2d 821, 824 (Tenn. Ct. App. 1971). In each of these circumstances, the courts have conceived that the parol evidence is not being used to vary the written contract but rather to prove the existence of another, separate contract.

The courts have also recognized certain circumstances that permit contracting parties to vary or to circumvent the plain terms of their written contract. Thus, the parol evidence rule does not prevent using extraneous evidence to prove that a written contract does not correctly embody the parties' agreement, *Davidson v. Greer*, 35 Tenn. (3 Sneed) 384, 384 (1855); *Rentenbach Eng'g Co., Constr. Div. v. General Realty, Ltd.*, 707 S.W.2d 524, 526–27 (Tenn. Ct. App. 1985); *Gibson County v. Fourth & First Nat'l Bank*, 20 Tenn. App. 168, 178–79, 96 S.W.2d 184, 190 (1936); 3 A. Corbin, *Corbin on Contracts* § 582 (1960), or to prove estoppel or waiver. *Woods v. Forrest Hills Cemetery*, 183 Tenn. 413, 421, 192 S.W.2d 987, 990 (1946); *Freeze v. Home Fed. Savs. & Loan Ass'n*, 623 S.W.2d 109, 112 (Tenn. Ct. App. 1981); *Bailey v. Life & Casualty Ins. Co.*, 35 Tenn. App. 574, 582, 250 S.W.2d 99, 102 (1952).

*Id*. at 610-11.

We affirm the summary dismissal of this claim against Sohr finding that the parol evidence rule bars the admission of evidence regarding the alleged oral agreement. The Exchange Agreement clearly provided that Sohr was to "purchase all of Ingram's Membership Interests in . . . SIS LLC." The Exchange Agreement defined "Membership Interests" as all of the membership interests in the Companies. The Agreement did not provide for any assets of any entities or corporations to be separately purchased, exchanged, or removed from any entities.

Further, the Exchange Agreement contained a Clause entitled "Interpretation", which clearly stated that:

All previous negotiations and understandings between Ingram and Sohr or their respective agents and employees with respect to the transactions set forth herein, whether oral or written, are merged into this Agreement which fully and completely expresses the parties' rights, duties and obligations. This Agreement, together with the related agreements contemplated hereunder, constitute the entire understanding between Sohr and Ingram and may be amended or modified only in a writing signed by Ingram and Sohr.

Considering the foregoing, we find the trial court correctly excluded the proffered evidence of Ingram and his agent, Sidwell, that the Atkins Note and Woodmont Receivable were not to be included in SIS Development at the execution of the Exchange Agreement as such evidence was parol evidence and therefore should be excluded as a matter of law. The evidence did not fall within one of the exceptions to the parol evidence rule as it was in conflict with the unambiguous terms of the integrated contract that was the Exchange Agreement. Although Ingram argues that the alleged oral agreement was a separate, collateral agreement, we find no merit to this characterization. The statements by Ingram are an attempt to redefine the membership interests of SIS Development by stating that SIS Development did not contain the two assets at issue.[15] The introduction of such evidence to vary the terms of the Exchange Agreement in which the parties clearly divided and transferred entities, not assets, is the exact type of evidence the parol evidence rule is designed to exclude in order "to protect the integrity of written contracts." *GRW Enterprises, Inc.*, 797 S.W.2d at 610 (citing *Maddox v. Webb Constr. Co.*, 562 S.W.2d at 201). Further, the introduction of a collateral, oral agreement would clearly contradict the Exchange Agreement's clause that states the Agreement is the "entire understanding" between the parties.

We also agree with the trial court's rejection of Ingram's argument that this claim should fall under the Errors and Omissions Agreement of the contract. The Errors and Omissions Agreement provides that:

> In the event any of the documents which evidence the Transaction . . . inaccurately reflect . . . the purpose and intent of the Exchange Agreement and the Transaction, and said misstatement or inaccuracy is due to unilateral mistake on the part of either of the Exchange Parties . . . or if any essential documents are not included with the legal instruments evidencing the Transaction . . . then in such event, each of the undersigned hereby agrees that, upon request by . . . any of the Exchange Parties, and in order to correct such . . . misstatement, inaccuracy, or omission, each of the undersigned shall execute such new or additional documents and instruments . . . as . . . the Exchange Parties may deem necessary to remedy said inaccuracy, mistake or omission.

Ingram argues that Sohr "mistakenly" failed to remove the assets out of SIS Development prior to the execution of the Exchange Agreement and that the Errors and Omissions Agreement provides that such mistakes will be corrected. Ingram does not contend that any "essential document" was not included with other documents, as this was an alleged

---

[15]We also find this argument somewhat disingenuous as Ingram originally argued that he was unaware of the existence of the Atkins Note and Woodmont Receivable.

oral agreement by the parties. Further, we note that the Exchange Agreement did not contain a parceled out description of the assets to be held by the entities divided, but merely listed the entities that each party was to transfer to the other party in order to complete the agreement. The financial statements provided to the parties prior to the Exchange Agreement showed that SIS Development was the owner of the Atkins Note and Woodmont Receivable. Thus, when the transactions identified in the Exchange Agreement occurred, and Sohr became the owner of SIS Development, he also became owner of the Atkins Note and the Woodmont Receivable.

### G. Renasant Bank Loan – The Guaranty and Indemnification Agreement

Ingram asserted a claim alleging that Sohr breached the Guaranty & Indemnification Agreement ("Indemnification Agreement") by failing to provide a satisfactory instrument of release and cancellation of a loan by Renasant Bank that was guaranteed by Ingram. The trial court summarily dismissed the claim upon the finding that Sohr obtained a release that satisfied his obligation under the Indemnification Agreement. Ingram contends this was error.

The Renasant loan was made in connection with the Waterbridge real estate development, which was owned by Stonegate Land Company. Pursuant to the Exchange Agreement and the Indemnification Agreement, Ingram transferred his interest in Waterbridge to Sohr in consideration for, *inter alia*, Sohr paying off the Renasant loan by October 10, 2010, and obtaining and providing to Ingram a full release from the bank of Ingram's guaranty of the loan. The Indemnification Agreement provided in pertinent part that Sohr would:

[O]btain a release and cancellation of the Ingram Guaranty on or before October 10, 2010 by delivering to Ingram an instrument of release and cancellation executed by the Lender, [Renasant Bank] or by delivering the original of the Ingram Guaranty to Ingram with a notation on its face signed and

dated by an authorized officer of Lender stating "Cancelled in Full as to all Guaranteed Obligations.

Sohr timely repaid the Renasant loan in full and, on August 23, 2010, Renasant Bank executed and delivered a written release of the Ingram Guaranty. Ingram, however, asserted that Sohr failed to obtain the type of release required by the Indemnification Agreement for which Ingram sought damages, or in the alternative, rescission of the Exchange Agreement due to Sohr's failure to obtain a "full, noncontingent release and cancellation of the guaranty."

There are no disputes of fact relevant to this issue; thus, the disposition of this issue rests solely on the interpretation of the language contained in the Indemnification Agreement.

The release provided by Renasant Bank stated:

1.      Subject to Section 2 below, the obligations of [H. Preston Ingram] under the Guaranty are hereby terminated, released and discharged.

2.      Notwithstanding the provisions of Section 1 above, in the event that the Lender is required by any court or regulatory agency to disgorge or turn over any portion of the Payment, then [Ingram's] liability under the Guaranty shall be reinstated to the amount of the Payment required to be disgorged and/or turned over.

The Indemnification Agreement obligated Sohr to pay the Renasant loan in full and obtain a release of Ingram's guaranty prior to October 10, 2010. On August 23, 2010, Sohr obtained a release from Renasant Bank which expressly stated that Ingram was "terminated, released and discharged" from his obligations under the Guaranty.[16] The Indemnification Agreement stated that Sohr must obtain and deliver to Ingram "an instrument of release and cancellation executed by the Lender [Renasant]," by October 10, 2010, and Sohr satisfied that obligation. Thus, we affirm the summary dismissal of this claim.

## H.  Alleged Fraudulent Transfer to the Sohr Family GRAT

Sohr sold 291,216.67 membership units in Correct Care Solutions, LLC ("CCS") to the Scott T. Sohr Family 2007 Grantor Retained Annuity Trust ("Sohr Family GRAT") for approximately $8 million.[17] The sale was effective July 31, 2007. In this action, Ingram asserts that Sohr's sale of his CCS membership units to the Sohr Family GRAT violated the Uniform Fraudulent Transfer Act, Tennessee Code Annotated § 66-3-301, because Sohr failed to receive a reasonably equivalent value for the CCS membership units and because the transfer occurred at a time when Sohr was insolvent or was thereby rendered insolvent. The trial court summarily dismissed this claim finding that Sohr received a reasonably equivalent value for the transfer of the membership units to the GRAT and was therefore entitled to summary judgment as a matter of law. Ingram contends this was error.

The Uniform Fraudulent Transfer Act, Tennessee Code Annotated § 66-3-305(a)(2) states that a transfer is constructively fraudulent if:

---

[16]On January 28, 2013, Renasant Bank issued a new release to Ingram that removed the reinstatement provision to which Ingram objected and provided that the Lender terminated, released, and discharged the Guarantor, Ingram, from any obligations under the guaranty.

[17]CCS is a healthcare company. At the time of the transfer CCS was principally owned by Ingram, Sohr, and another member.

(2) Without receiving reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

> (A) Was engaged or was about to engage in a business transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (B) Intended to incur, or believed and reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The trial court's decision to grant summary judgment to Sohr on this claim was based on the affidavit submitted by Sohr that he received the reasonably equivalent value of the membership interest at the time of the transfer. Sohr stated in his affidavit that the sales price was established by the law firm of Bass, Berry & Sims, PLC based on a sale of the units to a third party, Cary McClure, the Chief Financial Officer of CCS. The affidavit also stated that the other two primary shareholders of CCS, one of whom was Ingram, sold their membership interest in CCS to their respective family GRATs within sixty days of each other and the same unit price was used in all three sales. Furthermore, CCS's operating agreement required majority shareholder approval prior to any sale of membership units; thus, the sale of Sohr's membership units required Ingram's express consent, which consent was provided in writing by Ingram. Significantly, there is no countervailing evidence to Sohr's affidavit.

Although the term "reasonably equivalent value" is not defined in the UFTA, the trial court properly considered the evidence regarding the determination of the value for which Sohr would be paid, which was determined at the request of CCS's members by Bass, Berry & Sims, and which value was also used by Ingram when he transferred his membership units to the Ingram family GRATs.

The undisputed facts clearly established that Sohr received a reasonably equivalent value for his membership interests in CCS; thus, we affirm the summary dismissal of this claim.

### I. Ingram's Motion to Revise Fraudulent Transfer Ruling

After the trial court summarily dismissed the fraudulent transfer claims, Ingram filed a motion asking the trial court to revise that ruling. The trial court denied the motion to revise.

On appeal, Ingram asserts that the denial of his motion to revise was erroneous because, he contends, there was a genuine issue of material fact concerning whether Sohr

received "fair consideration" for the transfer of his interests in CCS. In support, Ingram argues that financial statements Sohr previously provided to Ingram show the value of Sohr's membership units for the period of June 30, 2007 to December 31, 2007 were well above the value that Sohr received for the membership units. Ingram points to the June 30, 2007 statement that valued the interest at $15,292,178, the December 31, 2007 statement that valued the interest at $17,207,247, and the September 30, 2008 statement that valued the interest at $18,355,233.

Ingram made this argument in his motion to revise the summary judgment ruling. However, while the financial records were referenced in the original summary judgment arguments, when Ingram argued the original motion for summary judgment, he merely asserted that the statements demonstrated Sohr's insolvency; Ingram did not rely on the financial statements to assert that Sohr did not receive a reasonably equivalent value in exchange for the transfer of his CCS units.

At the hearing on the motion to revise, the trial court ruled that the financial statements were inadmissible as to the reasonably equivalent value because they were hearsay and the court did not believe the statements were properly authenticated. Ingram asserts that this ruling was contrary to Tennessee Rule of Evidence 803(1.2), which provides that a party's own statement offered against himself is not hearsay, and that because the financial statements were provided by Sohr, the statements constitute admissions by a party opponent. Further, Ingram asserts that the financial statements were properly authenticated by an affidavit of Ingram in accordance with Tennessee Rule of Evidence 901(b)(1), which permits authentication by "testimony that a matter is what it is claimed to be." Based upon this argument, Ingram contends the trial court improperly excluded these financial statements, which created a disputed issue of fact; therefore, the trial court erred by summarily dismissing his fraudulent transfer claim.

A trial court's decision to grant or deny a motion to revise will only be overturned when the trial court has abused its discretion. *Harris v. Chern*, 33 S.W.3d 741, 746 (Tenn. 2000). Decisions regarding the admissibility of evidence rest within the sound discretion of the trial court. *Danny L. Davis Contractors, Inc. v. Hobbs*, 157 S.W.3d 414, 418-19 (Tenn. Ct. App. 2004) (citing *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn. 1992)). The trial courts are given wide latitude on evidentiary decisions and we will only overturn the trial court's decision upon a showing of abuse of discretion. *Id*. at 419. "The abuse of discretion standard requires us to consider: (1) whether the decision has a sufficient evidentiary foundation; (2) whether the trial court correctly identified and properly applied the appropriate legal principles; and (3) whether the decision is within the range of acceptable alternatives." *Id*. (citing *Crowe v. First Am. Nat'l Bank*, No. W2001–00800–COA–R3–CV, 2001 WL 1683710, at *9 (Tenn. Ct. App. Dec. 10, 2001) (citing *State ex rel. Vaughn v.*

*Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000))).

In our prior discussion of the trial court's fraudulent transfer summary judgment ruling, we affirmed the trial court. Nevertheless, we are now asked to reverse the trial court's decision to deny Ingram's motion to revise that order. To grant the relief Ingram requests, we must find that the trial court abused its discretion in excluding the financial reports based on lack of authentication as required under Tennessee Rule of Evidence 901 and Tennessee Rule of Civil Procedure 56.06. We, however, find no abuse of discretion.

The 2007 and 2008 financial reports provided by Sohr were "authenticated" by Ingram's affidavit to the extent he testified that Sohr provided them to Ingram. Tennessee Rule of Evidence 901 provides that authentication or identification is a condition precedent to the admissibility of evidence; this condition is generally satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims, which can include testimony of a witness with knowledge that the matter is what it is claimed to be. Tennessee Rule of Civil Procedure 56.06 states that supporting affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. To the extent that Ingram testified that Sohr provided the financial reports to Ingram, this condition precedent has been satisfied. That, however, does not establish the reports constitute trustworthy evidence of the reasonable value of the CCS membership units when they were transferred to the Sohr Family GRAT.

The foregoing notwithstanding, Ingram asserts that the personal financial records, which are based upon Sohr's personal opinion, are evidence of the reasonable value of the membership units. This assertion, however, is undermined by the fact that Ingram failed to provide evidence of the trustworthiness of the values stated; Ingram merely states that this is what Sohr provided. Based upon the lack of evidence to establish that the values stated in the financial reports are trustworthy, we find no abuse of discretion with the trial court's decision to exclude the personal financial statements.[18]

Based upon the foregoing, and finding that there were no genuine issues of material fact and the evidence demonstrated Sohr was entitled to judgment as a matter of law because he received the reasonably equivalent value for his membership units in CCS, we affirm the denial of Ingram's motion to revise the order summarily dismissing Ingram's fraudulent transfer claim.

---

[18]As we have found the trial court did not abuse its discretion in excluding the financial reports under Tennessee Rule of Evidence 901 and Tennessee Rule of Civil Procedure 56.06, we do not need to address Ingram's argument regarding Tennessee Rule of Evidence 803.

## II. Claims Dismissed on Directed Verdict

The trial court granted a directed verdict in favor of Sohr on several claims, only three of which are at issue in this appeal. We shall address each claim in turn. A motion for a directed verdict pursuant to Tennessee Rule of Civil Procedure 50.01 requires the trial court to determine as a matter of law whether the evidence is sufficient to create an issue for the jury to decide. *See Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 176 (Tenn. Ct. App. 1991). When considering a motion for directed verdict, the trial court must take the strongest legitimate view of the evidence and allow all reasonable inferences in favor of the non-moving party, while discarding all evidence to the contrary. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Dobson v. Shortt*, 929 S.W.2d 347, 349-50 (Tenn. Ct. App. 1996).

The standard of review on appeal from a motion for a directed verdict does not permit us to weigh the evidence. *Conatser*, 920 S.W.2d at 647; *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn. 1992). Moreover, it does not permit us to evaluate the credibility of the witnesses. *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). The standard requires that we review the evidence in the light most favorable to the motion's opponent, give the opponent the benefit of all reasonable inferences, and disregard all evidence contrary to the opponent's position. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000) (citing *Eaton*, 891 S.W.2d at 590). "We may affirm the motion 'only if, after assessing the evidence according to the foregoing standards, [we] determine[ ] that reasonable minds could not differ as to the conclusions to be drawn from the evidence.'"*Biscan v. Brown*, 160 S.W.3d 462, 470 (Tenn. 2005) (quoting *Childress v. Currie,* 74 S.W.3d 324, 328 (Tenn. 2002)).

### A. Belshire Walking Trail

Ingram asserted a claim against Sohr for breach of § 7(k) for failure to disclose an alleged liability of Harvey Development to build a walking trail for the Belshire development at an estimated cost of $34,300. The trial court granted a directed verdict to Sohr on Ingram's claim for breach of § 7(k).

The Belshire development, a residential community in Spring Hill, Tennessee, was owned and operated by Harvey Development, an entity Sohr transferred to Ingram pursuant to the Exchange Agreement. Ingram claimed that a contingent liability to construct a walking trail at Belshire existed based upon a May 2006 letter written by Sohr to the Mayor of Spring Hill and that Sohr breached the Exchange Agreement by failing to list this contingent liability on the financial statements of Harvey Development or on Schedule C of the Exchange Agreement as required under § 7(k). The May 2006 letter Ingram relies on states:

As discussed, Harvey Development, LLC will agree to develop and build an 8 ft. wide asphalt walking trail on top of existing sewer easement, on its property south of the bridge, at it's [sic] cost and then donate the improvement to Spring Hill. I have attached an exhibit showing the section. We would like to have this conditioned on Spring Hill committing that they will cause the balance of that trail to be completed.

During the trial, no evidence was introduced to show that Spring Hill responded to the letter, responded to the condition proposed by Sohr in order for the construction of the trail to occur, or that Spring Hill had, in fact, constructed any portion of the balance of the trail. Upon motion of Sohr at the close of Ingram's proof, the trial court directed a verdict in favor of Sohr finding that the letter did not contractually obligate Harvey Development to construct a walking trail and, therefore, there was no liability for Sohr to disclose.

In this appeal, Ingram argues that the trial court erred in finding no liability because the May 2006 letter was a contingent liability of Harvey Development and, therefore, should have been disclosed because § 7(k) requires the disclosure of both actual and contingent liabilities on Schedule C.

The determination of whether a contract has been formed is a question of law. *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009) (citing *Murray v. Tenn. Farmers Assurance Co.*, No. M2008–00115–COA–R3–CV, 2008 WL 3452410, at *2 (Tenn. Ct. App. Aug.12, 2008)). The interpretation of a contract and the ascertainment of the parties' intentions relating to the contract are also questions of law. *Id*. at 701-702. (citing *Guiliano*, 995 S.W.2d at 95; *Doe*, 46 S.W.3d at 196).

The only evidence introduced at trial concerning the Belshire Walking Trail was the letter quoted above, which does not rise to the level of a contract. The letter is simply a proposal that Harvey Development "will agree" to build a portion of the walking trail *if* Spring Hill committed to build the remainder of the trail. There was no evidence of any response from, or commitment or action taken by Spring Hill regarding the proposed walking trail. Finding that reasonable minds could not differ as to the conclusions to be drawn from the evidence presented concerning the alleged contingent liability of Harvey Development to construct part of the walking trail, we affirm the trial court's grant of a directed verdict to Sohr on this claim.

## B.  Bugg Hollow

Ingram asserted a claim that a $97,203 liability was mistakenly allocated to Bugg Hollow, LLC, a company Ingram received under the Exchange Agreement. He claimed that

he was entitled to relief from this mistake under the Errors and Omissions Agreement in the Exchange Agreement. The trial court granted a directed verdict on the claim.

The $97,203 liability was part of an $18 million balance on an outstanding credit line of IS Investment, which was allocated among the various properties that were transferred pursuant to the Exchange Agreement. The allocations were performed by Mike Baas, the former Controller of IS Investment; following the allocation by Baas, the parties and their respective attorneys reviewed and approved the allocations.

Ingram argues that the trial court improperly granted a directed verdict to Sohr based upon a faulty recollection of the evidence presented at the trial. Specifically, he points to his own testimony at trial that the liability was erroneously attributed to the Bugg Hollow. Ingram argues that the liability should have been divided equally between the parties. Sohr states that the trial court's decision was proper as Ingram presented no "competent evidence" that the Bugg Hollow liability was improperly allocated or that Sohr caused the allocation. Further, Sohr argues that the undisputed proof established that Mike Baas made the determination that the $97,203 outstanding balance should be allocated to Bugg Hollow.

Taking the strongest legitimate view of the evidence and allowing all reasonable inferences in favor of the non-moving party, in this case Ingram, we find that reasonable minds could reach but one conclusion on this claim. *Conatser*, 920 S.W.2d at 647; *Dobson*, 929 S.W.2d at 349-50; *Biscan*, 160 S.W.3d at 470. The undisputed evidence established that the allocation was determined by Mike Baas, at the request of the parties, and that following his allocation, it was given to both parties who reviewed and approved it prior to the Exchange Agreement. Thus, we affirm the grant of a directed verdict to Sohr on Ingram's claim that the $97,203 was improperly allocated to Bugg Hollow.

### C.  Claim Asserted by IS Investment, Inc.

IS Investment, Inc., also a plaintiff in this civil action, asserted a claim that Sohr, an officer and director of IS Investment, breached his fiduciary duty to the corporation by misusing the resources of IS Investment to pay his own family-owned businesses. The trial court directed a verdict on this claim finding the claim was barred by the one year statute of limitations set forth in Tennessee Code Annotated § 48-18-601 (2010). IS Investment asserts this was error.

As a preliminary matter, Sohr argues that IS Investment is not a party to this appeal; therefore, this issue is not properly before this court. Ingram and IS Investment insist that IS Investment was identified as a party taking an appeal from this ruling.

Tennessee Rule of Appellate Procedure 3(f) provides that:

The notice of appeal shall specify the party or parties taking the appeal by naming each one in the caption or body of the notice (but an attorney representing more than one party may describe those parties with such terms as "all plaintiffs," "the defendants," "the plaintiffs A, B, et al.," or "all defendants except X"), shall designate the judgment from which relief is sought, and shall name the court to which the appeal is taken. An appeal shall not be dismissed for informality of form or title of notice of appeal.

The notice of appeal filed in this action provides that: "The plaintiff, H. Preston Ingram ("Ingram"), hereby appeals to the Tennessee Court of Appeals. . . ." Throughout the rest of the body of the notice of appeal, only "plaintiff" singular is referenced. IS Investment, Inc., is, however, listed in the caption of the notice of appeal, which identifies the parties as "H. Preston Ingram and IS Investment, Inc." The attorney signature line also identifies the attorneys as representing both H. Preston Ingram and IS Investment, Inc. Therefore, IS Investment minimally complied with Rule 3(f) and is a party to this appeal.

Turning to the merits of the trial court's ruling granting a directed verdict against the claim by IS Investment, the trial court found the claim was barred by Tennessee Code Annotated § 48-18-601 (2010), which provides:

Any action alleging breach of fiduciary duties by directors or officers, including alleged violations of the standards established in § 48-18-301, § 48-18-302 or § 48-18-403, must be brought within one (1) year from the date of such breach or violation; provided, that in the event the alleged breach or violation is not discovered nor reasonably should have been discovered within the one-year period, the period of limitation shall be one (1) year from the date such was discovered or reasonably should have been discovered. In no event shall any such action be brought more than three (3) years after the date on which the breach or violation occurred, except where there is fraudulent concealment on the part of the defendant, in which case the action shall be commenced within one (1) year after the alleged breach or violation is, or should have been, discovered.

IS Investment asserts that the evidence demonstrated that Sohr caused the corporation to pay certain expenses in April, May, and June of 2009, which was less than one year prior to the filing of the complaint on April 28, 2010, and thus the dismissal of the breach of fiduciary claim related to these instances was clear error. IS Investment further argues that the determination of when the statute of limitations began to run was a question of fact for the

jury and the trial court could only grant a directed verdict if the uncontradicted evidence was such that no reasonable juror could conclude anything other than that IS Investment knew of, or should have known of, the need to investigate. IS Investment argues that no such uncontradicted evidence was introduced at trial. The corporation further argues that it was not until discovery in this action that IS Investment was able to fully confirm the extent to which it was paying the overhead costs for other companies associated with the location at 4521 Trousdale Drive.

IS Investment was the financial center of Stonegate, the parties' real estate venture, and the evidence introduced at trial established that IS Investment was on notice as early as June 2008 that employees of IS Investment were doing work for businesses solely owned by Sohr. Based in part on admissions by Ingram, also an officer and director of IS Investment, the proof established that Ingram, in June 2008, confronted Vicky Rutledge, Sohr's administrative assistant and questioned her regarding which companies' matters she was working on, and Ingram voiced objections to her salary being paid by IS Investment. A cause of action accrues and the statute of limitations begins to run when one discovers or reasonably should have discovered the alleged breach or violation. Tenn. Code Ann. § 48-18-601 (2010). The applicable limitation to this claim is one year. *Id*. The claim by IS Investment was filed in April 2010, which is outside of the one year statute of limitations that began to run in June of 2008.[19]   Thus, the trial court properly granted a directed verdict on this claim.[20]

### III.  JURY INSTRUCTIONS AND JURY VERDICT FORM

Ingram presents several challenges to the propriety of the jury instructions and the jury verdict form. "The propriety of jury instructions given in a particular case is a question of law, which we review de novo with no presumption of correctness." *Latiff v. Dobbs*, No. E2006-02395-COA-R3-CV, 2008 WL 238444, at *11 (Tenn. Ct. App. Jan. 29, 2008) (citing *Solomon v. First Am. Nat'l Bank*, 744 S.W.2d 935, 940 (Tenn. Ct. App.1989)). "When issues involving the jury charge are raised on appeal, we review the jury charge in its entirety and consider it as a whole in order to determine whether the trial court committed prejudicial error." *Id*. "The charge will not be invalidated as long as it fairly defines the legal issues involved in the case and does not mislead the jury." *Id*. (citing *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d

---

[19]While IS Investment contends on appeal that there were additional expenses in 2009 that fell within the statute of limitations, at trial, IS Investment only represented that the claim was for overhead expenses and salaries that were paid in 2006, 2007, and 2008. Thus, any claim related to expenses in 2009 has clearly been waived.

[20]We also note that Ingram brought a separate breach of contract claim against Sohr for the alleged overpayment of salary and expenses, which the jury rejected finding that Sohr did not cause IS Investment to improperly pay any salary or overhead expenses.

439, 446 (Tenn. 1992)). "Furthermore, we must abide by the mandate of Tennessee Rule of Appellate Procedure 36(b), which states: 'A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Id*.

## A. Section 7(k) Claims

Ingram asserts that the trial judge erroneously instructed the jury concerning his Section 7(k) claims. Specifically, he asserts that the instruction regarding Sohr's affirmative defense that Ingram's knowledge of the liabilities excused Sohr from disclosing the liabilities on Schedule C was erroneous. Ingram asserts the error entitles him to judgment for damages or, in the alternative, a new trial as to damages. He also asserts that providing the jury with a verdict form permitting the defense was error.

The jury found that Sohr breached § 7(k) of the Exchange Agreement by failing to list three liabilities on Schedule C of the Exchange Agreement.[21] However, the jury awarded no damages to Ingram upon the finding that Ingram had knowledge of all three liabilities at the time of the execution of the Exchange Agreement.

Earlier in this opinion we affirmed the trial court's dismissal of the other § 7(k) claims on summary judgment based upon Ingram's prior knowledge and § 8(b) of the Exchange Agreement. Based upon the reasoning set forth in that section, we affirm the trial court's instructions to the jury that Ingram's prior knowledge of the liabilities would result in no liability for Sohr under the provisions of the Exchange Agreement. Finding no error in the instructions, and therefore no error in the jury verdict form, we affirm the dismissal of the claims by the trial court as a result of the jury's findings.

## B. Acquiescence

Ingram asserts that the trial court erred in instructing the jury on the affirmative defense of acquiescence as a defense to his claim arising from Sohr's purchase of a parcel of land in a development called Riverwatch by Prescott Land Investments. Ingram contends that the purchase of this property was a breach of the Prescott Land Investments' Partnership Agreement. Further, Ingram contends that this affirmative defense was not specifically pled

---

[21] These three liabilities were sales commissions owed to Don Martin for the Canterbury development and two liabilities for boat slips to Holiday Landing by Tims Ford Development and Tims Ford North Development.

in Sohr's Answer and that the "novel application of 'acquiescence' is contrary to Tennessee law." We find no merit to these contentions.

In his Answer, Sohr specifically raised the affirmative defenses estoppel, waiver, and laches. In *Crye-Leike, Inc. v. Carver*, No. W2010-01601-COA-R3CV, 2011 WL 2112768, at *11 (Tenn. Ct. App. May 26, 2011), this court defined acquiescence as follows:

> "Acquiescence" has been defined as a conduct from which may be inferred an assent with a consequent estoppel or quasi-estoppel, *and also has been described as a quasi-estoppel, or a form of estoppel*. An acquiescence to a transaction is a person's tacit or passive acceptance, or an implied consent to an act. Generally, acquiescence as a defense has a dual nature in that, it may on the one hand, rest on the principle of ratification and be denominated an "implied ratification," *or, on the other hand, rest on the principle of estoppel and be denominated as "equitable estoppel*." The doctrine arises where a person knows or ought to know that he or she is entitled to enforce his or her right to impeach a transaction and neglects to do so for such a time as would imply that he or she intended to waive or abandon his or her right.

*Id*. (quoting 31 C.J.S. *Estoppel and Waiver* § 178 (2008); citing *Hinton v. Stephens*, No. W2000–02727–COA–R3–CV, 2001 WL 1176012, at *3 (Tenn. Ct. App. Oct. 4, 2001)) (emphasis added). Because Sohr pled the affirmative defense of estoppel in his Answer, and because acquiescence has been defined as a type of estoppel, we hold that Sohr raised the issue of acquiescence.

We also find that Ingram was given fair notice of the defense of acquiescence and an opportunity to rebut it. Throughout the trial, Sohr introduced and solicited evidence related to this defense, such that Ingram was on notice throughout the trial that Sohr was asserting the affirmative defense of acquiescence.[22] Our courts have held that the failure to plead an affirmative defense with specificity does not result in a waiver of the defense if "the opposing party is given fair notice of the defense and an opportunity to rebut it." *See Tip's Package Store, Inc. v. Commercial Ins. Mgrs., Inc.*, 86 S.W.3d 543, 553 (Tenn. Ct. App. 2001) (citing *George v. Building Materials Corp. of Amer.*, 44 S.W.3d 481, 486-87 (Tenn. 2001)). Evidence

---

[22]Based upon this, we hold that the trial court did not abuse its discretion when it permitted Sohr to amend his Answer to add the defense of acquiescence for two reasons. *See Zach Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 891 (Tenn. 1980). One, acquiescence has been treated by our courts as a form of estoppel, and two, because as Tennessee Rule of Civil Procedure 15.02 sets forth, the motion was to conform to the evidence presented at the trial. Contrary to Ingram's argument, we find the motion by Sohr was not an admission that acquiescence was never plead, but is more accurately a simple housekeeping measure. *See id.*

presented at trial included actions by Ingram taken following his initial email objection to the purchase of Riverwatch that implicitly approved the purchase such as Ingram signing loan documents that financed the purchase and signing documents confirming the sale of Riverwatch to a third party in December 2008. Thus, we hold that the trial court did not err in permitting the instruction of the affirmative defense of acquiescence to the jury and in including this defense on the jury verdict form.

Ingram also argues that the instructions given to the jury on acquiescence were contrary to Tennessee law. Ingram argues that if acquiescence is a subset of estoppel or waiver, then the trial court should have charged the jury using the standards for waiver set forth in Tennessee Pattern Jury Instruction 13.09 or estoppel as set forth in the comment to 13.09.

We note at the outset that the pattern jury instructions are not mandatory authority for instructions. *Cortazzo v. Blackburn*, 912 S.W.2d 735, 740 (Tenn. Ct. App. 1995). Further, as we noted previously, a jury instruction will not be determined as error where it clearly defines the legal issues involved and does not mislead the jury. *Latiff*, 2008 WL 238444, at *11; *see also Cortazzo*, 912 S.W.2d at 745 (citing *Otis*, 850 S.W.2d 439). The trial court instructed the jury on the defense of acquiescence as follows:

> If you determine that the defendant, Scott T. Sohr, breached any agreement with respect to the purchase of Riverwatch. . . you will then be asked to determine whether the plaintiff, Preston H. Ingram, acquiesced to any of these breaches.
>
> Acquiescence can occur in several ways so long as a plaintiff has knowledge, or sufficient notice or means of knowledge, of the material facts relating to the breach.
>
> The ways in which acquiescence can occur include when, one, a plaintiff freely does what amounts to a recognition of the breach as a valid act.
>
> Two, a plaintiff acts in a manner inconsistent with the repudiation of the breach.
>
> Or, three, a plaintiff lies for a considerable time and knowingly permits the defendant to deal with the subject matter under the belief that the transaction has been recognized or freely abstains from impeaching it.
>
> Acquiescence occurs if any of these actions by the plaintiff reasonably induce the defendant to suppose that the plaintiff does not intend to assert a claim based upon the breach.

If you determine that Ingram acquiesced in this manner to any of the breaches identified above, Ingram will be barred from recovering damages for those breaches for which he acquiesced.

Having reviewed this instruction in its entirety, we hold that the instruction was not contrary to Tennessee law. In fact, the instruction given by the trial court was consistent with *Crye-Leike v. Carver*, which we quoted at length above, and which recognized that acquiescence arises "where a person knows or ought to know that he or she is entitled to enforce his or her right to impeach a transaction and neglects to do so for such a time as would imply that he or she intended to waive and abandon his or her right." *Crye-Leike*, 2011 WL 2112768 at *11; *Hinton v. Stephens*, 2001 WL 1176012, at *3. Further, the instruction also comports with acquiescence as recognized in other cases in Tennessee including *Mood Realty Co. v. Huestis* wherein the court recognized that "a voidable contract can be ratified by acts or statements, and one who has failed to object timely to the circumstance while aware of it has confirmed its validity." 237 S.W.3d 666, 677 (2007) (citing *Valley Fidelity Bank & Trust Co. v. Cain Partnership, Ltd.*, 738 S.W.2d 638 (Tenn. Ct. App. 1987); *Russell v. Zanone*, 404 S.W.2d 539 (Tenn. Ct. App. 1966)).

The jury charge on acquiescence fairly defined the legal issues and did not mislead the jury, *Latiff*, 2008 WL 238444, at *11; *Cortazzo*, 912 S.W.2d at 745; therefore, we find no prejudicial error.

## IV. ATTORNEY'S FEES UNDER § 11(l) OF THE EXCHANGE AGREEMENT

The trial court awarded Sohr his attorney's fees and expenses that pertained to claims arising under the Exchange Agreement. Section 11(l) provides: "In the event Ingram or Sohr breaches any of their respective obligations under [the Exchange Agreement] and the other commences an action relating to such breach, the party prevailing in such action shall be paid such party's reasonable attorneys' fees and costs by the defaulting party." The trial court held that Sohr was the prevailing party on the vast majority of the claims for breach of the Exchange Agreement and that Sohr was entitled to recover his reasonable attorney's fees and costs pursuant to § 11(l) of the Exchange Agreement.

Ingram contends that the trial court erred in its interpretation of § 11(l) of the Exchange Agreement. He states that § 11(l) unambiguously provides that attorney's fees are available only in the event of a breach of the Exchange Agreement, and only to the party who is successful in proving such a breach against the defaulting party. Ingram argues that he did not breach the Exchange Agreement; therefore, Sohr was not entitled to recover his attorney's fees. Ingram further argues that he is entitled to recover his attorney's fees because he successfully demonstrated that Sohr breached the Exchange Agreement by failing to list actual

and contingent liabilities under Schedule C, failing to list material contracts on Schedule D, and failing to provide written notice of a fact likely to have a material adverse effect on the development or valuation of a Sohr Transferred Interest. Ingram additionally requests his reasonable attorney's fees and costs on appeal. For his part, Sohr contends the trial court properly awarded him his reasonable attorney's fees and costs; Sohr also seeks to recover his attorney's fees and costs on appeal.

"Litigants must pay their own attorney's fees absent a statute or agreement providing otherwise." *J & B Investments, LLC v. Surti*, 258 S.W.3d 127, 138 (Tenn. Ct. App. 2007) (citing *State v. Brown & Williamson Tobacco Corp.* 18 S.W.3d 186, 194 (Tenn. 2000)). A provision in a contract awarding attorney's fees will be enforced by the courts, limited to the situation agreed to by the parties in the contract. *Id.* (citing *Pullman Standard Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985); *Clark v. Rhea*, No. M2002-02717-COA-R3-CV, 2004 WL 63476, at *2 (Tenn. Ct. App. Jan. 13, 2004); *Pinney v. Tarpley*, 686 S.W.2d 574, 581 (Tenn. Ct. App. 1984)). The contractual provision regarding attorney's fees is subject to the rules of contract interpretation. *Id.* (citing *Clark*, 2004 WL 63476, at *2).

As noted earlier, the interpretation of a contract is a question of law. *Guiliano*, 995 S.W.2d at 95. Issues as to interpretation and application of unambiguous contracts are likewise issues of law, the determination of which enjoys no presumption of correctness on de novo appellate review. *Doe*, 46 S.W.3d at 196. Therefore, the trial court's interpretation of § 11(l) is not entitled to a presumption of correctness under Rule 13(d) on appeal. *Angus*, 48 S.W.3d at 730. Accordingly, we will review the contractual issues de novo and reach our own independent conclusions regarding their meaning and legal import. *Guiliano*, 995 S.W.2d at 95; *Hillsboro Plaza Enters.*, 860 S.W.2d at 47.

As the Exchange Agreement provides, in the event one of the parties breaches any of their respective obligations under the Agreement and the other commences an action relating to such breach, the party prevailing *shall* be paid his reasonable attorneys' fees and costs by the defaulting party. Although the term "prevailing party" is not defined in the Exchange Agreement, our courts have held that a prevailing party "is one who succeeded 'on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit,'" *Fannon v. City of LaFoullette*, 329 S.W.3d 418, 431 (Tenn. 2010), and that "the 'prevailing party' is the party 'who obtains some relief on the merits of the case or a material alteration in the legal relationship of the parties,'" *Isaac v. Center for Spine, Joint, & Neuromuscular Rehab.*, P.C., No. M2010-01333-COA-RW-CV, 2011 WL 2176578, at *8 (Tenn. Ct. App. Jun. 1, 2011)). Furthermore, in Tennessee "a party need not attain complete success on the merits of a lawsuit" in order to be considered the prevailing party, *Fannon*, 329 S.W.3d at 431.

The foregoing principles were discussed in *Dayton v. Ackerman*, No. M2010-00922-COA-R3-CV, 2011 WL 5183763 (Tenn. Ct. App. 2011), a decision we find instructive on this issue. The contract for sale in *Dayton* contained a provision stating: "In the event that any party hereto shall file suit to enforce this agreement (including suits filed after closing which are based on or related to the contract), the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees as determined by the court." *Id*. at *10. In that case, the purchasers of the home filed suit against the sellers for breach of warranty and damages for replacing windows in the home, the cost of shutters for the windows, and the cost of repairs for structural defects in the home. *Id*. at *1-2. The sellers, who prevailed on the claim for damages related to the structural repairs, asked the court to award them their attorney's fees. The trial court, however, denied the sellers' request because the buyers prevailed on the other claims. On appeal this court affirmed upon the reasoning that "each party prevailed on one of the claims, [thus] neither is necessarily 'the prevailing party.'" *Id*. at *11.

Ingram asserted a plethora of claims, approximately 39, that allege various breaches by Sohr of the Exchange Agreement. Ingram asserted five other claims that did not arise from alleged breaches of the Exchange Agreement and only the claims that arise from and pertain to alleged breaches of the Exchange Agreement are pertinent to the issue of attorney's fees under § 11(l) of the Exchange Agreement. In the following paragraphs we discuss generally the final disposition of Ingram's claims that allege breaches of the Exchange Agreement.[23]

The trial court summarily dismissed the following claims on the first motion for summary judgment: Fraud (Count I); violation of the Tennessee Consumer Protection Act (Count II); breach of fiduciary duty or fraud claims related to the Gladstone purchases in the First Amended Complaint; and breach of fiduciary duty or fraud claims related to the monetary distributions made to Ingram and Sohr by SIS Developments referenced in the First Amended Complaint. Following Sohr's second motion for summary judgment, the trial court dismissed Ingram's claims that Sohr breached an implied agreement to leave the Atkins Note and Woodmont Receivable out of the Exchange Agreement, that Sohr breached § 7(l) of the Exchange Agreement, that Sohr breached the express warranty in § 7(n) of the Exchange Agreement, and that Sohr violated the Tennessee Securities Act of 1980 in connection with the Exchange Agreement transaction. Following a third motion for summary judgment, the

---

[23]Realizing that a narrative summary of the plethora of claims filed by Ingram and the disposition of those claims can be confusing, Sohr's attorney provided a report to and for the benefit of the trial court, which identified all claims filed by Ingram and the disposition of those claims. The trial court included that report in its order and we include it as an Addendum to this opinion believing the report minimizes the confusion. Although the vast majority of the claims pertain to the Exchange Agreement, some of those listed do not, and we have not considered those that do not pertain to the Exchange Agreement in our analysis of the attorney fee provision.

trial court then dismissed the following claims: Ingram's claims concerning the Renasant bank guaranty and Ingram's breach of warranty claims under § 7(n) of the Exchange Agreement based upon the allegations set forth in paragraph 57 of the Second Amended Complaint. The trial court also granted, in part, Sohr's Motion to Revise the ruling on the breach of warranty claim under § 7(k) of the Exchange Agreement resulting in the dismissal of all liabilities Ingram contended Sohr failed to list on Schedule C of the Exchange Agreement except for four liabilities, which went to trial.

During the trial of the few remaining claims, the trial court granted a directed verdict as to Ingram's claims that Sohr failed to disclose a liability of Harvey Developments, LLC on Schedule C of the Exchange Agreement and that a liability of $97,203 for Bugg Hollow was mistakenly allocated to Ingram at closing. At the conclusion of the trial, the jury found that Sohr breached his warranty in section 7(k) of the Exchange Agreement by not listing the four remaining liabilities at issue on Schedule C; however, the jury found that Ingram had knowledge of the liabilities when the Exchange Agreement was executed; therefore, based upon this finding, the trial court also dismissed this claim.

As for Sohr's one claim that pertained to the Exchange Agreement, the trial court granted Ingram's Second Motion for Partial Summary Judgment on Sohr's Counter-Claim, which alleged Ingram had breached the warranty contained in § 6(k) of the Exchange Agreement. Thus, Ingram prevailed in the defense of this claim.

The trial court found that Ingram was the prevailing party as to the claims that Sohr breached the Exchange Agreement for the failure to list liabilities on Schedule C; however, the court found that Sohr was also the prevailing party on his counterclaim that Ingram breached the same provision. Thus, neither party can be considered the prevailing party as to these two competing claims. As for all other claims arising from the Exchange Agreement, it cannot be disputed that Sohr is the prevailing party because all of Ingram's claims that Sohr breached the Exchange Agreement were either summarily dismissed, dismissed upon a directed verdict, or dismissed based on the jury's verdicts.[24]

Based upon the disposition of the claims, we have concluded that Sohr is the prevailing party of the claims arising under the Exchange Agreement because he prevailed on all but one claim (Sohr's counter-claim) relating to the alleged breaches of the Exchange Agreement and

_____

[24]The following claims, in which Ingram prevailed, did not arise from the Exchange Agreement; thus, they are not relevant to the attorney fee provision in § 11(l) of the Exchange Agreement: the claim for ownership of the BMW Alpina; the value of the airline miles given by Ingram to Sohr that had not been repaid, for which the jury awarded Ingram $9,750; and $11,478.65 from $74,835.69 in funds held in escrow by a law firm.

Sohr is the one who clearly obtained the most relief on the merits by defeating all of Ingram's claims arising under the Exchange Agreement. *See Fannon*, 329 S.W.3d at 431; *see also Isaac*, 2011 WL 2176578, at *8. Therefore, we affirm the trial court finding that Sohr is the "prevailing party" under § 11(l) of the Exchange Agreement and the award of attorney's fees to Sohr.

## V. Indemnification Claims Not Arising From The Exchange Agreement

### A. Prescott Land Investments

Sohr asserted that he was entitled to indemnification from Prescott Land Investments of his attorney's fees and costs arising from claims challenging the propriety of acts he performed on behalf of the partnership. The trial court awarded Sohr $27,079.79 in attorney's fees based upon the indemnification provision in the Partnership Agreement of Prescott Land Investments. Ingram contends this was error.[25]

The pertinent provision is Section 2.5 of the Agreement provides:

The Partners shall be entitled to indemnification from the Partnership for any act performed by them within the scope of the authority conferred on them by this Agreement, except for acts of malfeasance, gross negligence, fraud, or misrepresentation; provided, that any indemnity under this section shall be paid only out of, and to the extent of, Partnership assets.

Ingram argues that Sohr is not entitled to indemnification under this provision, because he was not acting "within the scope of authority conferred" on him, since his action in purchasing Riverwatch was in breach of the Partnership Agreement as found by the jury. Although the jury found that Sohr breached the Partnership Agreement by purchasing the Riverwatch property, the jury found that Ingram acquiesced to the purchase and, therefore, the jury awarded Ingram no damages. Other claims arising for breach of fiduciary duty arising from the Prescott Land Investments Partnership Agreement were also dismissed based upon knowledge imputed to Ingram. Nevertheless, Ingram asserts that Sohr is not entitled to indemnification because there was no finding that Sohr's actions were not malfeasance.

The indemnity clause for the Partnership Agreement provides that a partner is entitled to indemnification for acts performed "within the scope of the authority" conferred on them

---

[25]Sohr contends Ingram lacks standing to challenge the indemnification by Prescott Land Investments. Prescott Land Investments was a partnership between Ingram and Sohr and thus Ingram has standing to challenge an award under the Partnership Agreement.

by the Partnership Agreement. The jury found that Sohr's purchase of the Riverwatch property violated the Partnership Agreement; however, the jury also found that Ingram acquiesced to the purchase. Sohr contends that the acquiescence of his action ratifies his actions and, thus, his acts cannot constitute malfeasance, gross negligence, fraud, or misrepresentation. Therefore, Sohr insists he was entitled to indemnification for the expense of defending the claims arising from the Partnership Agreement. Conversely, Ingram insists that his acquiescence does not cure Sohr's malfeasance.

We have concluded previously that Ingram acquiesced in the actions taken by Sohr; thus, Ingram cannot subsequently argue, when the parties relationship is fractured, that the acquiesced actions constitute malfeasance, gross negligence, fraud, or misrepresentation. Accordingly, we affirm the trial court's determination that Sohr was entitled to indemnification in the amount of $27,079.79 for the attorney's fees and costs he incurred defending Ingram's claims arising under the Partnership Agreement of Prescott Land Investments in the trial court.

We also find that Sohr is entitled to indemnification of the reasonable and necessary attorney's fees and costs he incurred in this appeal; on remand the trial court shall set the amount and award judgment accordingly.

### B. IS Investment, Inc.[26]

Sohr asserted that he was entitled to indemnification from IS Investment of his attorney's fees and costs in fees incurred in the defense of claims asserted by IS Investment. The trial court awarded Sohr $58,025.98 in fees incurred in the defense of these claims. Ingram and IS Investment contend this was error.

The award was based upon the court's interpretation of Article V, § 2 of the by-laws of IS Investment, which states:

> The corporation shall indemnify to the fullest extent permitted by law any and all persons who may serve or who have served at any time as directors or officers, or who at the request of the board of directors of the corporation may serve or at any time have served as directors or officers of another corporation in which the corporation at such time owned or may own shares of stock or of which it was or may be a creditor, and their respective heirs, administrators, successors, and assigns, against any and all expenses, including amounts paid

---

[26]We note that Sohr contends Ingram lacks standing to challenge the indemnification judgments. We have previously determined that IS Investment, Inc. is a party to this appeal and thus there is standing.

upon judgments, counsel fees, and amounts paid in settlement (before or after suit is commenced), actually and necessarily incurred by such persons in connection with the defense or settlement of any claim, action, suit, or proceeding in which they, or any of them, are made parties, or a party, or which may be asserted against them or any of them, by reason of being or having been directors or officers or a director or officer of the corporation, or of such other corporation, except in relation to matters as to which any such director or officer or person shall be adjudged in any action, suit, or proceeding to be liable for his own negligence or misconduct in the performance of his duty. *Such indemnification shall be in addition to any other rights to which those indemnified may be entitled under any law, bylaw, agreement, vote of shareholders, or otherwise.*

Ingram challenges the award on two fronts. One, he asserts that the award should be set aside because, as we addressed earlier, the trial court erred in granting Sohr a directed verdict concerning the claim of IS Investment that Sohr breached his fiduciary duty. He further asserts that indemnification was not permissible under Tennessee's corporate statutory scheme.

The trial court rejected the argument made by Ingram that Tennessee only permits indemnification of "an individual made party to a proceeding because the individual is or was a director," citing to Tennessee Code Annotated § 48-18-502(a), or to an officer, employee, or agent sued as a result of a position, but only, Ingram contends, if such person is not also a director, citing to Tennessee Code Annotated § 48-18-507. The trial court found that Ingram provided no authority to support this contention; the court also found that public policy favors indemnification of officers and directors. We agree with the trial court.

Ingram also asserts that the award of indemnification based upon the bylaws of IS Investment was error. We disagree. The bylaws expressly provide, in pertinent part, that "[t]he corporation shall indemnify to the fullest extent permitted by law any and all persons who may serve or who have served at any time as directors or officers, . . ." Furthermore, the bylaws state that indemnification under § 2 is "in addition to any other rights to which those indemnified may be entitled under any law, bylaw, agreement, . . ." Therefore, the fact that Sohr served as both an officer and director of IS Investment would not preclude him from entitlement to indemnification. Accordingly, we affirm on this issue as well.

## VI. POST-TRIAL MOTION FOR RECUSAL

Ingram made a post-trial motion for recusal contending the trial court's "impartiality might reasonably be questioned" on remand. The motion was denied; Ingram contends this was error.

The motion for recusal was made on May 10, 2012, prior to the effective date of Tennessee Supreme Court Rule 10(B).[27] Thus, the former legal principles apply. *Baker v. Baker*, No. M2010-01806-COA-R3-CV, 2012 WL 764918, at *6 (Tenn. Ct. App. Mar. 9, 2012). Under the Code of Judicial Conduct in effect prior to July 1, 2012, decisions concerning recusal are addressed to the sound discretion of the judge asked to be recused and "the judge's decision will not be reversed on appeal unless a clear abuse appears on the face of the record." *See State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995).

The sole basis of Ingram's motion for recusal was the adverse rulings by the trial court and what Ingram describes as "the nature" of the rulings, specifically the trial court's statements regarding the definition of "defaulting" party under the attorney's fee provision of the Exchange Agreement. Adverse rulings by a trial judge, however, are not usually sufficient to establish bias. *State v. Cannon*, 254 S.W.3d 287, 308 (Tenn. 2008). Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification. *Duke v. Duke*, 398 S.W.3d 665, 671 (Tenn. Ct. App. 2012) (citing *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994)). Ingram has referenced the adverse rulings but he failed to provide *more* as *Duke* and *Alley* note is required. Thus, we find the ground asserted to demonstrate bias is insufficient to require recusal and the record is wholly insufficient for this court to find "clear abuse" in the trial court's decision to deny the motion for recusal.

## VII. DISCRETIONARY COSTS

The trial court assessed $24,348.83 in discretionary costs against Ingram; Ingram contends this was error.

Tennessee Rule of Civil Procedure 54.04(2) states that the trial court may award costs, in its discretion, to the prevailing party. These costs are now referred to as discretionary costs. The rule goes on to provide that a prevailing party may recover the following discretionary costs:

---

[27]By its expressed provisions, Tennessee Supreme Court Rule 10(B) applies to motions for recusal filed on or after July 1, 2012; it does not apply to motions for recusal filed prior to July 1, 2012. *Baker v. Baker*, No. M2010-01806-COA-R3-CV, 2012 WL 764918, at *6 (Tenn. Ct. App. Mar. 9, 2012).

[R]easonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

Parties are not automatically entitled to costs under Tennessee Rule of Civil Procedure 54.04(2) simply because they prevail at trial. *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998). When deciding whether to award discretionary costs the equities of the case are to be considered. *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992). As a general rule, however, the courts should award discretionary costs to a prevailing party if the costs are reasonable and necessary and if the prevailing party has filed a timely and properly supported motion. *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35 (Tenn. Ct. App. 2002). When determining whether to award discretionary costs, trial courts are directed to: (1) determine whether the party requesting the costs is the "prevailing party;" (2) limit awards to the costs specifically identified in the rule; (3) determine whether the requested costs are necessary and reasonable; and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled. *Id.*

The award of discretionary costs is within the trial court's reasonable discretion, *Perdue*, 837 S.W.2d at 60, and the abuse of discretion standard does not permit this court to second-guess the lower court's judgment or merely substitute an alternative we prefer. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). Therefore, we are to affirm the discretionary decision so long as reasonable legal minds can disagree about its correctness. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). A trial court abuses its discretion only if it (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous evaluation of the evidence. *Elliott v. Cobb*, 320 S.W.3d 246, 249–50 (Tenn. 2010).

In this case, the trial court found that Sohr was the prevailing party. In fact, as the trial court noted, Sohr prevailed on all but three of the approximately thirty-nine claims asserted by Ingram, including claims for breach of fiduciary duty, malfeasance, and breach of various provisions of the Exchange Agreement. We concur with the trial court's determination that Sohr was the prevailing party in the trial court. Based upon that determination, it was within the sound discretion of the trial court to assess discretionary costs against Ingram. We find no abuse of discretion in the trial court's decision to assess $24,348.83 in allowable discretionary costs against Ingram. Thus, we affirm the award of discretionary costs to Sohr.

## VIII. Attorney's Fees and Costs Incurred on Appeal

Both parties seek to recover attorney's fees and costs they have respectively incurred in this appeal. The decision whether to award attorney's fees and costs on appeal is solely within the discretion of this court. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995).

We have affirmed the award of attorney's fees to Sohr that were incurred at trial. Further, as our opinion clearly reveals, Sohr has prevailed on all issues in this appeal. Accordingly, we find that Sohr is entitled to recover the reasonable and necessary attorney's fees he incurred in this appeal which pertain to issues arising from the Exchange Agreement. We also find that Sohr is entitled to recover the reasonable and necessary attorney's fees and costs incurred on appeal as they pertain to the claims related to Prescott Land Investments based upon the indemnification provision in the Partnership Agreement. Further, we find that Sohr is entitled to recover his reasonable and necessary attorney's fees and costs incurred on appeal as they pertain to the claims related to IS Investment as provided in Article V, § 2 of the bylaws of the corporation.

We, therefore, remand these issues to the trial court to set the reasonable and necessary attorney's fees and costs Sohr is entitled to recover under the Exchange Agreement, the Partnership Agreement of Prescott Land Investments, and the bylaws of IS Investment.

## In Conclusion

The judgment of the trial court is affirmed and this case is remanded for further proceedings consistent with this opinion. Costs of appeal assessed against H. Preston Ingram.

_____
FRANK G. CLEMENT, JR., JUDGE

**ADDENDUM**

The report of the claims asserted by Ingram and their disposition provided by Sohr's attorney to the trial court is set forth below. It appears as it did in the trial court's order.

I.  Claims dismissed by summary judgment dated January 28, 2011

    a.      Fraudulent inducement (i) Fuller Appraisals (ii) McFarlin Property (iii) Charles Note (iv) Atkins Note and (vii) Woodmont Receivable

    b.      Tennessee Consumer Protection Act claims (same as above)

    c.      Breach of Fiduciary Duty & Fraud claims re: Gladstone condo purchase

    d.      Breach of Fiduciary Duty & Fraud claims re: Riverwatch property purchase

    e.      Breach of Fiduciary Duty & Fraud claims re: IS Investment, Inc. monetary purchase

    f.      Breach of Fiduciary Duty & Fraud claims re: SIS Development, LLC monetary distributions

II.  Claims dismissed by summary judgment dated May 3, 2011

    a.      Fraudulent Transfer claim re: Sohr's 2007 grantor retained annuity trust ("GRAT")

III.  Claims dismissed by summary judgment dated July 17, 2011

    a.      Claims re: Atkins note

    b.      Claims re: Woodmont Receivable

    c.      Breach of Warranty § 7(n) claim re: Fuller Appraisals

    d.      Breach of Warranty § 7(1) claim re: Charles Note

    e.      Tennessee Securities Act claims

IV.  Claims dismissed by summary judgement dated November 4, 2011

    a.      Breach of Contract claim re: Renasant Bank Guaranty

    b.      Breach of Fiduciary Duty claims re: allegations in subparts (a) through (j) of paragraph 57 of the Second Amended Complaint

    c.      Breach of Warranty 217(n) claims re: allegations of subparts (a) through (j) of paragraph 57 of the Second amended Complaint

    d.      Breach of Warranty § 7(k) claim re: all but four liabilities allegedly omitted from Schedule C to Exchange Agreement

V. Trial - November 7-16, 2011

    a.       Claims dismissed by Directed Verdict

          i.        Breach of Warranty § 7(k) claim re: Belshire walking trail
          ii.       Breach of Contract claim re: IS Investment, Inc., monetary distributions
          iii.      Breach of Fiduciary Duty claim re: Bugg Hollow Liability
          iv.      Breach of Contract claim re: Bugg Hollow Liability
          v.        Breach of Fiduciary duty claim re: misuse of resources of IS Investment, Inc.

    b.       Jury Verdict in favor of Sohr

          i.        Breach of Warranty § 7(k) claim re: Don Martin liability
          ii.       Breach of Warranty § 7(k) re: boat slips liability of Tims Ford, LLC
          iii.      Breach of Warranty § 7(k) re: boat slips liability of Tims North Ford, LLC
          iv.      Breach of Contract claim re: Riverwatch property purchase
          v.        Breach of Contract claim re: misuse of resources of IS Investment, Inc.
          vi.      Declaratory Judgment claim re: Waller escrow account (Sohr only obligated to pay 42.5% of RC Properties Note)

    c.       Jury Verdicts Against Sohr

          i.        Breach of oral contract claim re: airline miles ($9,750.00)
          ii.       Declaratory Judgment claim re: Waller escrow account (RC Properties loan amount understated in promissory note by $24,703 ($11,478.65 awarded out of $74,000 escrow account).